15101

SMITH v. SMITH

(9 S. E. (2d), 584)

250

*Messrs. S. E. Haley, C. Victor Pyle* and *James H. Price,* for appellant,

*Messrs. Williams & Henry,* for respondent,

June 14, 1940.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

The respondent obtained a judgment against the appellant, J. Harold Smith, in the sum of $425.00 actual damages, and $425.00 punitive damages, growing out of an action for slander. The defendant is appealing from this judgment upon numerous exceptions.

The gist of the action is found in the allegations of Paragraph 2 of the complaint, which we here quote: "That on or about June 1, 1938, while the defendant was conducting a religious service before a great audience in Hendersonville, North Carolina, and contriving and maliciously intending to injure the plaintiff in her good name, fame, reputation, and credit, and to bring her into public shame, infamy and disgrace among her friends and acquaintances, and to cause her to be shunned and to be suspected by her friends and acquaintances of unlawful conduct, introduced the Reverend Dean Smith to the assembled congregation and in said introduction falsely and maliciously spoke of and concerning the plaintiff the following false and defamatory words: 'I don't blame him (Reverend Dean Smith) for not living with his wife; she poisoned him'; and also other words of like falsity and defamation."

It is admitted that the alleged defamatory statement related to plaintiff, who is the wife of the Reverend Dean

Smith. The appellant by his answer admitted making the alleged slanderous statement, alleged the truth of the statement, and pleaded justification and qualified privilege.

Before discussing the many legal questions presented by the appeal, it becomes necessary to give a brief review of the facts appearing in the record.

The plaintiff married Dean Smith (not related to the appellant) in February, 1927, at Spartanburg. Prior to and at the time of his marriage, and until 1933, he led a wild, reckless, and dissipated life, sometimes at work, but frequently unemployed, and drifting from one place to another. Between 1927 and 1933 the plaintiff separated from her husband ten times.

The evidence shows that the husband, Dean Smith, was converted in 1933, while attending a meeting in Pennsylvania, after which he was licensed to preach as a Baptist minister. In the fall of 1934 he was the pastor of two small country churches, and resided in Chesnee, in this State, near the North Carolina line. Upon his solicitation, the plaintiff who was living with her mother in Spartanburg and who earned her livelihood by sewing, agreed to live with him in the home he had established at Chesnee. They lived together about five weeks, and separated finally on the 18th day of December, 1934. The plaintiff testified that the separation came about because her husband wished to go to school. The husband says that their marital life was not peaceful, and that he told the plaintiff that in his opinion she was not the kind of wife a minister should have, and that he could not live with her and do the work he was called to do. That she then said, "I would live with her or I would not live with anybody."

It was agreed between the plaintiff and Dean Smith following their last night together, that the latter would take his wife to Spartanburg and leave her at her mother's home there. No breakfast was prepared in the home that morning. It appears that the husband was in the habit of drinking a

quart of sweet milk every day, and, according to his evidence, the plaintiff suggested to him, before taking their departure, that he drink his milk, which was in a quart fruit jar on the dining room table. This statement the wife denies. He offered her some of the milk, which had been delivered the day before, which she refused to drink, and he thereupon drank the whole quart. He then took his wife to Spartanburg. Shortly before he reached his home at Chesnee on his return trip, he began to experience violent stomach pains, and was confined to his bed for four or five days. The doctor who attended him testified that he suffered from ptomaine poisoning, or what is generally known as an upset stomach, which results from food poisoning. The doctor says that he made no chemical analysis of the contents of the stomach, but that the patient was not suffering from any chemical poisoning. He also said that he had treated Dean Smith three or four times before for an upset stomach, and on none of those occasions had he been chemically poisoned.

But Dean Smith testified he believed the plaintiff had poisoned him by placing poison in his milk.

Plaintiff since the separation in December, 1934, has never lived with her husband, but has been making her home with her mother in Spartanburg. She had repeatedly heard it rumored that she had tried to poison her husband by giving him poisoned milk, but could never trace the rumor to its source.

Four years later, in May, 1938, the appellant, Reverend J. Harold Smith, whose work was principally in the evangelistic field, held a revival meeting in Chesnee, and stayed at the home of Dean Smith. He says that while at Chesnee the deacons of the Baptist Church there told him about the rumors which were being circulated about Dean Smith and his wife; that during the course of the week's meeting at that point at least 100 people told him about the alleged poisoning, and he felt that the separation of Smith from his wife was adversely affecting the work of Dean Smith

as a minister. He conceived the idea of effecting a reconciliation, and accompanied by Dean Smith went to Spartanburg to see the plaintiff. While at the home of plaintiff's mother, in the presence of plaintiff and Dean Smith, he engaged in prayer, and asked divine guidance in reconciling the husband and wife. He says that while yet on his knees the plaintiff withdrew from the room, and calling Dean Smith attempted to engage him in a violent quarrel. He is not corroborated in this statement either by the plaintiff or by Dean Smith. On the contrary, the plaintiff and Dean Smith positively testify that their conversation took place on the porch after the prayer was completed. In any event, the plaintiff did not return to live with her husband.

The following month, in June, 1938, the appellant was engaged in holding an evangelistic service in Hendersonville, North Carolina, at which time Dean Smith was sitting on the speaker's platform together with several other visiting ministers. He requested Reverend Dean Smith to stand up and introduced him to the audience, numbering about 1,500 people. He admits making this statement to the congregation: "I don't blame him for not living with his wife; she poisoned him." The evidence of the defense tends to show that he was preaching about the conjugal life of Samson and Delilah, and emphasizing how sometimes a man makes a wrong choice of a wife. The appellant says that he was merely using the Reverend Dean Smith's unhappy plight by way of illustration, and in addition to this he hoped in this way to help him in his ministry, and in a sense rehabilitate him; that he felt that Dean Smith's ministry was being somewhat affected by the separation and the rumors concerning him and his wife, and he wanted the congregation to know that he was Dean Smith's friend.

The appellant disclaimed any intention to slander or hurt the plaintiff in any way, and denied that he entertained any feeling of ill will or malice toward her.

Shortly after the defamatory statement was made the plaintiff heard of it at her home in Spartanburg. She says she did not know what to do, but consulted her sister, who, as a result of their conversation, called the appellant over the telephone. Mrs. Bell, the sister, testified that in the telephone conversation with appellant she asked him if he had made the statement that the plaintiff had poisoned her husband, and he said "he did and did not have any apology whatsoever to make"; and further that he did not feel that he had been rash in making the statement. The following week the plaintiff and her sister, Mrs. Bell, still seeking a correction of the defamatory statement, called upon the appellant at the Spartanburg radio station, where he was scheduled to broadcast. At that time the appellant told them that his information with reference to the poisoned milk came not only from Dean Smith himself, but also from the attending physician, Dr. Cash; and that if they would obtain and bring to him a statement from Dr. Cash to the effect that Dean Smith was not poisoned, he would denounce Dean Smith for having misrepresented the case to him. Appellant in his testimony denied that his information came from Dr. Cash, but refused to make any correction with reference to the defamatory statement. And so far as the record shows, no statement was obtained from Dr. Cash until he testified at the trial that Dean Smith had not been poisoned.

Appellant first assigns error because over his objection the respondent was permitted to testify that $15,000.00, the amount of damages claimed, would not compensate her for the damages which she had sustained.

The elements of damage in an action of this kind are humiliation, wounded feeling, injury to reputation, and other elements. Respondent testified that her friends had snubbed her, and that she had suffered in her dressmaking business as a result of the defamatory words, which, of

course, were actionable *per se,* and the law presumes general damages.

It is claimed, however, that the respondent was permitted to testify as to her damages, without giving a single fact which would justify them. The case of *Cothran v. Knight,* 45 S. C., 1, 22 S. E., 596, which is cited in support of the contention, lacks much of doing so. In that case it was said: "The witness was not interrogated as to the facts upon which he based his opinion, although the case was one in which they could be reproduced and made palpable, in the concrete, to the jury."

In *Jones v. Fuller,* 19 S. C., 66, 45 Am. Rep., 761, which is cited in *Cothran v. Knight, supra,* it was held that while it is necessary that the witness should first state the facts upon which to base his opinion, where the facts are such as are capable of being reproduced in language, it is not necessary to do so where the facts are not capable of reproduction in such a way as to bring before the minds of the jury the condition of things upon which the witness bases his opinion. Such evidence is competent from the necessity of the case. We find no error.

Nor in our opinion did the Court err in permitting the respondent to offer in evidence, over objection, several North Carolina decisions bearing upon the question of slander. It is alleged that appellant had no notice of these decisions until they were offered in evidence, and that their introduction in evidence was prejudicial. Respondent made no effort to plead any statutory law of the State of North Carolina, in which state the defamatory words were uttered, but a mere reference to the complaint shows that it was alleged that the Courts of the State of North Carolina "have held and now hold that slanderous words are actionable *per se* when they impute to another the commission of a crime involving moral turpitude, and that the slanderous words referred to plaintiff as of the time she and her husband lived in Chesnee, South Carolina."

Appellant argues that the apparent purpose of the complaint was to bring the case within the law of South Carolina, and that it was intended to allege that appellant had accused respondent of an attempted poisoning in the latter state; and that whether the alleged act was a crime would depend upon the law of South Carolina, and not the law of North Carolina. In another portion of his argument, in discussing another question, appellant admits that the law of North Carolina was invoked. In our opinion, under the quoted allegations of the complaint, the North Carolina decisions were properly admitted in evidence. It was not necessary to refer to the cases by title nor to allege the book and page where reported.

The defense offered as a witness Reverend Burt Atchison, of Hendersonville, who was in the congregation at the time of the utterance of the alleged slanderous words. He was asked by defense counsel what interpretation he placed upon the words uttered by the appellant, and whether or not he thought the appellant by the use of such words charged the respondent with having tried to kill her husband. The Court excluded these questions, for which error is assigned.

The appellant takes the position that the evidence was admissible on the authority of the case of *Jenkins v. Southern Ry. Co.*, 130 S. C., 180, 125 S. E., 912, 913, which announces the rule: "If words are susceptible of two meannigs, one imputing a crime, and the other innocence, the latter is not to be adopted, and the other rejected, as a matter of course. In such a case, it must be left to the jury to decide in what sense the defendant used them. Their conclusion must be formed from the whole of the circumstances attending the publication, including the sense in which the witnesses understood the words."

The rule for which appellant contends is applicable where the meaning of the words used are doubtful and ambiguous and are susceptible of two meanings. In the case at

bar, the words are plain and unambiguous, and the principle announced in *Milam v. Railway Express Agency,* 185 S. C., 194, 193 S. E., 324, 113 A. L. R., 667, applies.

Appellant assigns error because respondent was permitted, over objection, to go back upon the stand as a witness in reply, and contradict one of the appellant's material witnesses upon a purely collateral matter.

George Scruggs, a defense witness, was questioned by counsel for the respondent, whether he was a friend or an enemy of the plaintiff. And he was also asked if he had not gone to plaintiff's home for the purpose of getting her to sign some separation or divorce papers. The witness denied this, and said he went to plaintiff's home as a member of a church committee to discuss with her a reconciliation with her husband. The plaintiff in reply testified that Scruggs had come to her home in connection with divorce proceedings.

The general rule undoubtedly is that a witness cannot be cross examined as to any fact which is collateral to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, to discredit his testimony. *State v. Wyse,* 33 S. C., 582, 592, 12 S. E., 556. Conceding that the evidence complained of was inadmissible, we think its admission was harmless and inconsequential. There is no showing that this evidence could have prejudiced the appellant as to the merits of this case. *Snipes v. Augusta-Aiken Ry.,* 151 S. C., 391, 149 S. E., 111; *Murphy v. Valk,* 30 S. C., 262, 9 S. E., 101.

The trial Court overruled motions for nonsuit and directed verdict, which were made upon the ground that there was no evidence tending to show that it was a criminal or indictable offense under the laws of North Carolina to make an attempt to poison another. A motion for a new trial was overruled, made upon the same ground.

The jury were instructed that the alleged slanderous words, alleged in the complaint to have been spoken by the defendant of the plaintiff, were actionable *per*

*se,* because they charged a crime involving moral turpitude under the law of North Carolina, in which state they were uttered. The jury were also instructed that the alleged defamatory words charged a crime under the law of South Carolina, that is, it is slanderous *per se* to charge one with poisoning or attempting to poison another.

We think the Court committed no error in giving the instruction complained of. It was held in the *North Carolina case* of *Jones v. Brinkley,* 174 N. C., 23, 93 S. E., 372, 373 : "If the offense charged involves 'moral turpitude,' which is defined to be 'an act of baseness, vileness, or depravity in the private and social duties that a man owes to his fellow man or to society in general, contrary to the accepted and customary rule of right and duty between man and man' (25 Cyc., 272), then such charge, if false, is ground for an action of slander if orally made, and for an indictment or action for libel if made in writing or printed." And to the same effect is *Cotton v. Fisheries Products Company,* 177 N. C., 56, 97 S. E., 712.

Furthermore, the administering of poison was a crime at common law. *State v. Glover,* 27 S. C., 602, 4 S. E., 564. At common law, an assault, and an assault and battery, are indictable offenses. 6 C. J. S., Assault and Battery, page 915, § 58. Administering poison or any other harmful drug or substance to a person with intent to inflict injury amounts to assault and battery. 6 C. J. S., Assault and Battery, page 924, § 70.

Generally speaking, a *battery* is the unlawful touching or striking of another by the aggressor himself or by any substance put in motion by him, done with the intention of bringing about a harmful or offensive contact which is not legally consented to by the other, and not otherwise privileged. 4 Am. Jur., Section 2, Page 125. It is sometimes defined as any injury done to the person of another in a rude, insolent, or revengeful way. *State v. Beck,* 1 Hill 363, 26 Am. Dec., 190. While the word "force" suggests to the mind physical power, nevertheless, in the

case of battery, deception may be the equivalent of force. Thus, a battery is committed where one person administers a drug to another by inducing the other voluntarily to take the drug in the belief that he is taking some other substance, or by placing the drug in some otherwise harmless substance and inducing the other to take such substance without knowledge that it contains a drug. The deceit practiced in such a case by means of which the person is induced to take the drug, is a fraud on his will equivalent to force. 2 Am. Jur., Section 19, Page 138; *Carr v. State,* 135 Ind., 1, 34 N. E., 533, 20 L. R. A., 863, 41 Am. St. Rep., 408; *Commonwealth v. Stratton,* 114 Mass., 303, 19 Am. Rep., 350.

Having reached the conclusion that an assault and battery is involved in the unlawful infliction of an injury by administering poison, and that this is a crime at common law in South Carolina *(State v. Glover, supra),* we may also safely presume that upon the same facts as are alleged in the complaint in the case at bar a common-law right of action could be maintained in North Carolina. It would be presumed that the common law is in force in that State.

The Circuit Court charged the jury that in the light of the evidence adduced in this case, the alleged slanderous remarks were neither absolutely nor qualifiedly privileged, and hence that the burden was not cast upon the plaintiff to prove falsity or constructive malice under the laws of North Carolina.

Appellant charges error under the cases of *Gattis v. Kilgo,* 128 N. C., 402, 38 S. E., 931, and *Hartsfield v. Harvey C. Hines Co.,* 200 N. C., 356, 157 S. E., 16, 19.

It was held in *Gattis v. Kilgo, supra,* that privilege is a question of law, and is to be determined by the Court. The Court determines what is and what is not privilege. And in *Hartsfield v. Harvey C. Hines Co., supra,* the Court held: "The legal distinctions between absolute and qualified privilege are pointed out in the decisions. Qualified privilege

rests upon the fact of interest or duty. That is to say, if the speaker of the alleged slanderous words has an interest or duty in the subject-matter of the conversation, and the hearer has an interest or duty with respect to the subject-matter of the conversation, then the doctrine of qualified privilege applies. 'If the words are actionable *per se* in "unprivileged" slander and libel, falsity and malice are *prima facie* presumed.   *   *   *' "

In the *Hartsfield case* the conversation alleged to be privileged was held in the private office of the defendant; the subject-matter of the conversation disclosed by the evidence was certain irregularities in handling the cash, invoices and other records of the business. All of the persons present were officers and employees of the defendant, and directly interested in any charge of theft or embezzlement which was the subject-matter of the conversation.

But in the case at bar the facts are entirely different. There is no contention here that the machinery of church discipline was in motion; there was no trial or any church investigation on. Appellant admits that he was preaching a sermon to a congregation composed of people from the countryside, supposedly affiliated with many other church denominations, and doubtless many with no church affiliation of any kind. He says that he used the alleged defamatory statement merely by way of illustrating a point in his sermon, and that he never thought of making such an illustration until he happened to look around and saw Dean Smith, plaintiff's husband, sitting on the speaker's stand. He did testify that he also thought such a statement would help Dean Smith in his ministry. But it cannot be soundly held that he had any interest or duty in regard to the matter on the occasion when he uttered the alleged slanderous words. And certainly his hearers had no interest or duty with respect to the matter. We agree with the Circuit Judge that under the testimony the doctrine of qualified privilege did not apply.

Appellant complains that his motion for a new trial should have been granted, with reference to punitive damages, as there was no evidence to show malice on the part of the defendant.

The Court instructed the jury that punitive damages, in an action for slander under the North Carolina law, cannot be awarded in the absence of proof of express malice importing hatred or ill will. And appellant contends that there was absolutely no evidence of any hatred, ill will, or malice on his part toward the respondent. It is conceded that malice could be proven by direct or circumstantial evidence. *Ferrell v. Siegle,* 195 N. C., 102, 141 S. E., 474.

It was the view of the Circuit Judge that the facts and circumstances disclosed by the testimony amply warranted the jury in concluding that actual or express malice had been made out by the preponderance of the evidence. We think his view was correct. The alleged slanderous words were spoken from the pulpit to an assemblage of 1,500 people, based upon current rumors and suspicions. The sensational charge was made without consulting the physician who attended the plaintiff's husband. When requested by the plaintiff and her sister to correct the statement it was neither corrected nor investigated; nor was apology given therefor. It also appears that the appellant was under the belief that the plaintiff was grossly disrespectful and irreverent in interrupting the prayer he made for the reconciliation of husband and wife. We think under the circumstances the evidence made a jury question as to punitive damages.

The last point made by the appellant is that the Circuit Court committed error in charging the jury that a plea of justification, set up as a defense in an action of slander charging a criminal offense, must be supported by evidence sufficient to convince a jury beyond a reasonable doubt of the commission of the alleged offense.

The weight of authority, as well as sound principles of reason, is in accordance with the rule that questions of evidence are covered by the law of the forum. 11 Am. Jur., Section 203, Page 52. The Circuit Court followed the rule laid down in the early case of *Burckhalter v. Coward*, 1881, 16 S. C., 435. It has been reaffirmed in several later cases, notably, *Gill v. Ruggles,* 95 S. C., 90, 78 S. E., 536, and *Duncan v. Record Publishing Company,* 145 S. C., 196, 143 S. E., 31. Appellant asks that these cases be reviewed with a view to overruling them.

Undoubtedly, as to the quantum of proof necessary to establish the defense of truth in a slander case, the great weight of modern authority is to the effect that even though the plaintiff has been accused of crime, it is sufficient for the defendant to establish his defense of justification by a preponderance of the evidence; and that proof of the charge beyond a reasonable doubt is not required. The earlier cases held to the contrary. In some states the rule was changed by statute to conform to the modern theory. 17 R. C. L., Section 179, Pages 420, 421. Annotations, 7 Ann. Cas., 1158; 10 L. R. A. (N. S.), 1052; 91 Am. St. Rep., 306; 37 C. J., Section 510, Page 88.

In *Burckhalter v. Coward, supra,* it was held:

"Although it was not a criminal proceeding, a crime was charged, and the authorities hold in such case that it is proper to make the same proof which would be necessary to convict the party in a criminal proceeding for that crime.

" 'If the plaintiff has been tried and convicted, the conviction may be given in evidence in support of the plea of justification. If a man be adjudged by the Sessions to be the father of a bastard child, the adjudication is an answer to any complaint made by him in the spiritual Court or elsewhere against anyone for saying or publishing that he has had a bastard. When the plaintiff has not been actually convicted of the felony he must be tried by the jury upon the plea of justification in the same way as if he was on his trial upon an indictment for the offense in a crimi-

nal Court; so that if there is a doubt of his guilt the jury are bound to give him the benefit of the doubt.' "

It is said that the doctrine grew out of a misconception of principle, and we are inclined to that view.

The general rule in civil cases is that a party having the burden of an issue shall succeed upon that issue if he can bring to his aid a preponderance of the evidence. We know of no exception to this rule in this State, except in the case of slander where the defendant justifies the speaking of words which charge the plaintiff with the commission of a criminal offense. Many eminent lawyers and jurists have condemned the rule in this class of cases. However, the rule has been settled and followed in this State for more than fifty years, and we feel it our duty to give it *stare decisis* effect, much as we may favor the unification of the rules of evidence. Doubtless if the operation of the rule had resulted in general disapproval, a change would have been brought about by legislation, as has been done in several other jurisdictions.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM, MESSRS. JUSTICES BAKER and STUKES and MR. ACTING ASSOCIATE JUSTICE J. STROM THURMOND concur.