James Leonard TOMASH, Appellant,

v.

JOHN DEERE INDUSTRIAL EQUIPMENT COMPANY and Power Equipment Company, Appellees.

No. 84–1891.

Supreme Court of Iowa.

Jan. 14, 1987.

Phillip D. Seidl and Mary K. Hoefer of The Tom Riley Law Firm, P.C., Cedar Rapids, for appellant.

Scott E. McLeod of Lynch, Dallas, Smith & Harman, Cedar Rapids, for appellee John Deere Indus. Equipment Co.

Patrick M. Roby and Diane Kutzko of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellee Power Equipment Co.

Considered by REYNOLDSON, C.J., and HARRIS, WOLLE, LAVORATO, and NEUMAN, JJ.

REYNOLDSON, Chief Justice.

Plaintiff James Leonard Tomash filed a petition against defendants John Deere Industrial Equipment Company (Deere) and Power Equipment Company (PEC) alleging abuse of process and intentional infliction of emotional distress. After Tomash presented his evidence, trial court directed verdicts for defendants on both counts. The court of appeals reversed and remanded for new trial. After further review, we vacate the court of appeals' decision and affirm trial court's judgment.

The controlling facts are largely undisputed. To the extent facts or the inferences to be drawn from them are disputed, we of course construe the evidence in Tomash's favor. Iowa R.App.P. 14(f)(2), (17); *Poulsen v. Russell*, 300 N.W.2d 289, 296 (Iowa 1981).

October 31, 1977, Tomash purchased from PEC a Steiger Bearcat tractor and an Ashland I–100 pull scraper (hereafter collectively referred to as "tractor"). The tractor purchase price was approximately $36,800. PEC allowed a credit of approximately $9300 on a trade-in, leaving an unpaid balance of $27,500.

This balance was to be paid on contract with the tractor subject to a security agreement. PEC sold and assigned the contract and security agreement to Deere. November 2, 1978, Deere perfected its security interest in the tractor.

April 26, 1978, after making three payments totaling approximately $2950, Tomash sold the tractor to Clinton Rice for $20,000. Tomash deposited Rice's check in a joint account he and his wife maintained at the Merchants National Bank in Cedar Rapids. This deposit brought the account up to $20,266.

Tomash, who was experiencing marital difficulties, then left the state. Before leaving, Tomash asked his wife to pay the balance due on the tractor. She did not, and within a week of the sale Tomash wrote over $11,000 worth of checks on the checking account. None of this money went to Deere.

In September 1978, Tomash was contacted by Robert DeLeon, Deere's finance manager. DeLeon reported to Tomash the latter's wife had made only two monthly payments on the tractor. Three payments had not been received, and as a result the tractor contract was in default $3800.

Tomash told DeLeon the tractor had been sold. DeLeon, rather than demand immediate payment in full as was his right under the security agreement, warned Tomash he must bring his payments up to date. DeLeon also agreed to allow Tomash, whose financial situation was precarious, to seek replacement collateral. Replacement collateral was never obtained.

Tomash, however, was able to pay the $3800 then due and continued making monthly payments through January 1979. In February 1979, Tomash asked Deere for a two-month deferral. DeLeon agreed to this request.

Tomash later made two additional payments before completely defaulting on his contract obligation. Although Tomash made significant payments throughout the period prior to final default, he also bounced numerous checks and in general substantially hindered DeLeon's attempts to collect the money due, to locate the tractor, and to secure new collateral.

Finally recognizing further collection efforts would be futile, DeLeon, on Deere's behalf and as allowed under the financing agreement in effect between Deere and PEC, reassigned Tomash's contract and security agreement to PEC. The reassignment was made on February 18, 1980. If no collection could be made by PEC, Deere agreed to bear $5000 of the loss; PEC would bear the balance.

April 23, 1980, Virgil Peters, PEC's manager, signed a complaint in the Cedar Rapids Police Department. Peters' complaint supplied the following as a factual basis: "Mr. Jim Tomash on October 31, [19]77, purchased on contract 2 items—1. Steiger Bearcat Tractor; and 2. Ashland pull type Scraper[.] ... [T]o this date [Tomash] has not paid the contract balance due." An independent police investigation was undertaken. Between April 23 and December 4, 1980, PEC's attorney, James Benz, twice contacted the county attorney concerning the progress of the investigation.

December 4, 1980, the Linn County attorney filed first-degree theft charges against Tomash. Four days later an associate district court judge found the charge was supported by probable cause and issued a warrant for Tomash's arrest. Tomash subsequently was arrested on December 22, 1980, and was freed on bond the following day. A trial information was filed on January 13, 1981, and listed Peters and DeLeon as witnesses. Because Clinton Rice, the primary prosecution witness, died before trial, charges against Tomash were dismissed March 11, 1981, on motion of the county attorney.

The record discloses that during the time the above criminal case was pending Tomash's financial affairs were entangled in the United States Bankruptcy Court for the Northern District of Iowa. April 27, 1981, that court determined Tomash had "willfully and maliciously converted the tractor or the proceeds realized from the sale thereof to his own benefit and to the detriment of [PEC]." The court entered judgment against Tomash for the value of the tractor as a nondischargeable debt.

June 21, 1982, Tomash instituted the present action, claiming abuse of process and intentional infliction of emotional distress. As stated, trial court directed verdicts in favor of defendants and dismissed Tomash's petition. After the court of appeals reversed trial court's judgment, we granted Deere's and PEC's motions for further review.

I. The elements necessary to demonstrate an abuse of process are well established in Iowa. Most recently, in *Grell v. Poulsen*, 389 N.W.2d 661 (Iowa 1986), we reiterated that:

> One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.

*Id.* at 663 (quoting Restatement (Second) of Torts § 682 (1977)); *Schmidt v. Wilkinson*, 340 N.W.2d 282, 284 (Iowa 1983); *Mills County State Bank v. Roure*, 291 N.W.2d 1, 4 (Iowa 1980); *see also Sarvold v. Dodson*, 237 N.W.2d 447, 448–49 (Iowa 1976).

In short, to succeed in such a claim two elements must be shown: (1) legal process; and (2) its use in an improper or unauthorized manner. These two elements focus largely on the actual misuse of otherwise properly issued legal process, and are easily contrasted with the elements of malicious prosecution, which focus primarily on the malicious institution of criminal proceedings without probable cause. *See Sisler v. City of Centerville*, 372 N.W.2d 248, 251 (Iowa 1985).

To establish improper use of process, plaintiff must show "[s]ome act or threat directed to an immediate objective not legitimate in the use of the process." *Schmidt*, 340 N.W.2d at 284 (quoting Restatement (Second) of Torts § 682 app. (1981)). For example, the use of criminal process to coerce or extort an individual to pay a debt or to take some action or refrain from taking it is an abuse of process. *Id.* However, if an individual does no more than initiate and prosecute a criminal or

civil action to its authorized conclusion, no abuse of process can be shown, regardless of the individual's malicious intent in doing so. *Grell*, 389 N.W.2d at 663–64; *Schmidt*, 340 N.W.2d at 284; *Froning & Deppe, Inc. v. South Story Bank and Trust Co.*, 327 N.W.2d 214, 215 (Iowa 1982).

At bottom, as we stated in *Grell*: "An[y] act which is proper in the regular prosecution of a proceeding cannot be relied upon as a basis for an abuse of process claim." 389 N.W.2d at 664. Rather, to show abuse of process, plaintiff must show defendants took some "specific action in connection with their use of process which can be characterized as unlawful or irregular." *Id.* In other words, plaintiff must show defendants "committed some act in the use of process that was not proper in the regular prosecution of the proceeding." *Id.*

■ The record is barren of any credible evidence from which a jury reasonably could find Deere either initiated or misused legal process. The overwhelming evidence shows the criminal investigation leading to Tomash's arrest was initiated solely by PEC when it lodged its complaint in the Cedar Rapids Police Department. Deere initiated no criminal proceeding against Tomash and, while aware PEC was considering such action, was not involved in its decision to do so. Once the complaint was made by PEC, Deere neither supported nor encouraged the investigation leading to the formal filing of theft charges. There was uncontradicted evidence that two and one-half years passed before Deere became aware formal charges actually had been filed against Tomash.

■ In response, Tomash attempts to rely on an isolated comment in a letter from DeLeon to PEC that never mentioned criminal charges, and on DeLeon's name appearing on the trial information's minutes of testimony as evidence Deere was involved in initiating legal process against Tomash. These isolated traces of Deere's asserted activities do not constitute substantial evidence that Deere played any significant role in initiating or prosecuting the criminal proceedings. Rather, these fragments of evidence are purely circumstantial in nature. They support Tomash's contention only by use of "surmise, speculation, or conjecture" and are of "[in]sufficient probative force to constitute the basis for a legal inference." *Harsha v. State Savings Bank*, 346 N.W.2d 791, 800 (Iowa 1984); *see also Montgomery Ward, Inc. v. Davis*, 398 N.W.2d 869, 872 (Iowa 1987). Circumstantial evidence giving rise to no more than innuendo and unsupported surmise is not substantial in nature. *Harsha*, 346 N.W.2d at 800.

Even if Deere was shown conclusively to have initiated legal process against Tomash, no recovery could be had. Very simply, the record contains no evidence Deere in any way misused legal process. Tomash testified he had no conversation with any Deere employee after June 1979, a year and one-half before formal charges were brought. Further, the record indicates the last correspondence between Deere and Tomash occurred in February 1980, over nine months before formal charges were filed. Tomash also testified Deere never sued him. Finally, Tomash never suggested Deere used the threat of criminal charges to coerce him into paying his debt. Even the letter and minutes of testimony Tomash relies on appear to have been seen by him only shortly before trial.

■ Turning to PEC, we assume PEC's lodging (through Peters) of a criminal complaint against Tomash constituted an initiation of legal process. Though formal charges were filed only after a wholly independent investigation and decision to prosecute, the making of the complaint was an act that without question started the procedure. While no improper use of the criminal complaint occurred in this case, it is foreseeable a similar criminal complaint might in different circumstances be used in "an attempt to secure from another some collateral advantage not properly includable in the process itself." *Schmidt*, 340 N.W.2d at 284–85 (quoting *Sarvold*, 237 N.W.2d at 449).

We also note PEC's lodging of a complaint was undertaken properly and was an ordinary step in the criminal legal process in Linn County. The county attorney himself testified approximately 1000 of these complaints are received each year. Further, the factual allegations in PEC's complaint were true. No suggestion can be made this report, occurring under normal circumstances and in the regular course of police affairs, itself constituted a misuse of process. This conclusion remains the same regardless of PEC's intent in making the complaint. *See Grell,* 389 N.W.2d at 664.[1]

The key inquiry here as in most abuse of process cases is whether PEC misused the legal process. To most graphically emphasize Tomash's total failure to prove misuse, we turn to Tomash's testimony. On Tomash's cross-examination, the following exchange with PEC's attorney occurred:

Q. Now, what I want to know is from the time you sold the tractor to Mr. Rice in April of '78 until today, have you spoken with any employees of Power Equipment Company concerning the tractor or the payments or the lack of payments? A. I only talked to someone once during that period.

Q. At Power Equipment? A. Yes.

Q. What did you talk about? A. Again, I can't say, I don't remember his name. It was the salesman that was involved, and I sold a tractor when I purchased the tractor.

Q. When did you talk to him? A. Maybe the same day that I sold the tractor, or a day or so afterwards, just as I was leaving the state. He was coming out to my place, and I met him on the road going to Ely.

Q. Since that time, since April, or let's say May of 1978, have you ever talked to anyone at Power Equipment Company? A. I don't recall; I don't think I did.

Q. Has any person at Power Equipment ever written you a letter, ever called you on the telephone and told you that if you don't pay your debt, we're going to have the cops out after you, or we're going to file charges against you, anything like that? A. I've never talked to anyone concerning that, no.

Q. So am I understanding it that no one at Power Equipment has ever threatened you with anything; isn't that correct? A. That's—yes, I believe that's correct.

The remainder of the record is devoid of any evidence contradicting this powerful evidence that legal process was not misused by PEC.

Because no evidence of misuse was presented, Tomash's abuse of process claim against PEC, like his claim against Deere, was properly dismissed.

■ II. We briefly turn to Tomash's claim of intentional infliction of emotional distress. The elements of this tort are:

(1) Outrageous conduct by the defendant;

(2) The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) Plaintiff has suffered severe or extreme emotional distress; and

(4) Actual proximate causation of the emotional distress by the defendant's outrageous conduct.

*Northrup v. Farmland Industries,* 372 N.W.2d 193, 197 (Iowa 1985) (quoting *Vinson v. Linn-Mar Community School District,* 360 N.W.2d 108, 118 (Iowa 1984)).

■ No outrageous conduct on the part of these defendants has been shown. "For conduct to be outrageous it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Reihmann v. Foerstner,* 375 N.W.2d 677, 681 (Iowa

---

**1.** If a similar complaint were filed today, even the admitted intent to seek collection of an uninsured civil debt might be viewed as an appropriate purpose for initiating criminal proceedings in light of the legislature's express public policy favoring victim restitution. *See* Iowa Code §§ 910.1–.15 (1985).

1985) (quoting Restatement (Second) of Torts § 46 comment d (1965)); *see also M.H. by and through Callahan v. State*, 385 N.W.2d 533, 539 (Iowa 1986); *Northrup*, 372 N.W.2d at 198.

Here, the only conduct potentially actionable involves PEC's or Deere's alleged part in the bringing of criminal charges. We have noted the record discloses no activity by Deere in that proceeding. PEC's conduct in this regard was a regular step in the criminal process in Linn County and was reasonably appropriate under the circumstances of this case. That conduct can in no way be viewed as "outrageous" under the stringent standard adopted by our prior cases. *See Reihmann*, 375 N.W.2d at 681.

Trial court in this case properly granted defendants' motions for directed verdict.

DECISION OF COURT OF APPEALS VACATED AND JUDGMENT OF DISTRICT COURT AFFIRMED.