492 S.E.2d 103

**Anne T. HAINER, Petitioner,**

**v.**

**AMERICAN MEDICAL INTERNATIONAL, INC., East Cooper Community Hospital, Inc., Cindy Woltman, Patricia Condon, and Katherine Sellers, Respondents.**

**No. 24702.**

Supreme Court of South Carolina.

Heard Jan. 21, 1997.

Decided Oct. 14, 1997.

Justin O'Toole Lucey, Mount Pleasant, for petitioner.

E. Douglas Pratt–Thomas and Allison M. Carter of Wise, Pratt–Thomas, Pearce, Epting and Walker, Charleston, for respondents.

WALLER, Justice:

We granted certiorari to review the Court of Appeals' opinion in *Hainer v. American Med. Internat'l, Inc.*, 320 S.C. 316, 465 S.E.2d 112 (Ct.App.1995). We affirm as modified.

## FACTS

Petitioner, Anne T. Hainer (Hainer), was a registered nurse at East Cooper Community Hospital (Hospital). She was disciplined by the State Nursing Board for "patient abandonment" when, without notifying appropriate personnel, she resigned her position on July 16, 1989.

Hainer subsequently instituted this action for abuse of process and intentional infliction of emotional distress (outrage) against Hospital,[1] claiming it wrongfully reported her to the State Nursing Board. The jury returned a verdict of $75,000.00 actual and $225,000.00 punitive damages for Hainer. The Court of Appeals reversed, finding Hospital entitled to a directed verdict on both causes of action. We granted certiorari and instructed the parties to brief the following questions:

1. May a truthful communication be malicious under S.C.Code Ann. § 40–33–936 (1986)?

2. If so, was there any evidence of malice?

3. Was there evidence of abuse of process to withstand a directed verdict motion?

4. Was there evidence of intentional infliction of emotional distress sufficient to withstand a directed verdict motion?

---

1. The hospital and its employees are referred to herein collectively as Hospital.

## 1. MALICE UNDER § 40–33–936

In addressing the abuse of process claim, the Court of Appeals focused on the statutory privilege contained in S.C.Code Ann. § 40–33–936 (1986), which provides that a communication to the Nursing Board is privileged "except upon proof that such communication was made with malice." Essentially, the Court of Appeals held that, as the Board found Hainer guilty of misconduct, Hospital had just cause to report her, and therefore the report could not have been maliciously made.[2] Accordingly, it held Hospital was properly granted a directed verdict on this claim.

S.C.Code Ann. § 40–33–936 (1986) provides, in part:

Every communication, whether oral or written, made by ... any person, ... to the Board ... shall be privileged: and no action or proceeding, ... shall lie against any such person, ... on whose behalf such communication shall have been made ..., except upon proof that such communication was made with malice.

It is uncontested the report to the Board was true[3] and that Hospital has a duty to report "misconduct."[4] Accordingly, the issue is whether, under such circumstances, a report may ever be deemed malicious.

 We find no authority for the proposition that truth negates malice as a matter of law. On the contrary, truth is clearly not dispositive of the element of malice in a number of causes of action. *See e.g. Upchurch v. New York Times,* 314 S.C. 531, 431 S.E.2d 558 (1993) (truth not a defense to intentional infliction of emotional distress); *Huggins v. Winn–Dixie, Greenville, Inc.,* 249 S.C. 206, 153 S.E.2d 693 (1967) (unlike malicious prosecution claim, plaintiff need not prove prior action unfounded to sustain abuse of process claim), *see also* Hubbard and Felix, *The South Carolina Law of Torts,* 342 (1990) (hereinafter Hubbard & Felix) (abuse of process

---

**2.** In light of this finding, the logical extension would have been for the Court of Appeals to hold that the statutory privilege of § 40–33–936 preempted both the abuse of process and the outrage claims.

**3.** The circuit court ruled, and the Court of Appeals held, Hainer was collaterally estopped to relitigate the issue of her misconduct.

**4.** S.C.Code Ann. § 40–33–970 requires employers of nurses to report any instances of misconduct.

claims founded on perversion of process, rather than illegality); *Snakenberg v. The Hartford Cas. Ins. Co.*, 299 S.C. 164, 383 S.E.2d 2 (Ct.App.1989) (tort of wrongful publicizing of private affairs); *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E.2d 39 (Ct.App.1984) (invasion of privacy).[5] Accordingly, we find the fact that the report was true does not negate malice as a matter of law.

Further, we are unpersuaded by Hospital's claim that, because it had a statutory duty to report misconduct, malice is precluded. Where the terms of the statute are clear, the court must apply those terms according to their literal meaning. *Adkins v. Varn*, 312 S.C. 188, 439 S.E.2d 822 (1993). This Court cannot construe a statute without regard to its plain and ordinary meaning, and may not resort to subtle or forced construction in an attempt to limit or expand a statute's scope. *Berkebile v. Outen*, 311 S.C. 50, 426 S.E.2d 760 (1993). See also *Estate of Guide v. Spooner*, 318 S.C. 335, 457 S.E.2d 623 (Ct.App.1995) (if Legislature had intended certain result in statute, it would have said so).

Nothing in § 40–33–936 evinces a Legislative intent to exempt truthful communications from a finding of malice. If the fact of the duty negated malice, the Legislature would have granted an absolute privilege since there is a duty to report all perceived misconduct, and the statute makes no distinction for the reporting of truthful versus untruthful information. We therefore find that the filing of a truthful report pursuant to § 40–33–936 does not negate malice as a matter of law.[6]

Further, we find that, in order to defeat the privilege afforded reports made pursuant to § 40–33–936, a plaintiff must demonstrate the defendant made the communication with common law actual malice.[7]

---

5. Moreover, it is patent that truthful information may be divulged in a malicious manner as, for example, disclosure of the fact that a person has a venereal disease, is an adulterer, a racist, etc.

6. The fact that a report is both truthful and pursuant to a statutory duty may, however, be relevant to the jury's determination of whether the defendant in fact acted with malice.

7. We note that, in using the term "actual malice," we do not refer to what is commonly known as "constitutional actual malice." There is a

Privileged communications are either absolute or qualified. When a communication is absolutely privileged, no action lies for its publication, no matter what the circumstances under which it is published, i.e., an action will not lie even if the report is made with malice. *Richardson v. McGill,* 273 S.C. 142, 255 S.E.2d 341 (1979); *Wright v. Sparrow,* 298 S.C. 469, 381 S.E.2d 503 (Ct.App.1989); *Crowell v. Herring,* 301 S.C. 424, 392 S.E.2d 464 (Ct.App.1990). When qualified however, the plaintiff may recover if he shows the communication was actuated by malice. *Id.* One publishing under a qualified privilege is liable upon proof of actual malice. *Constant v. Spartanburg Steel Products,* 316 S.C. 86, 447 S.E.2d 194 (1994). Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights. *Constant v. Spartanburg Steel Products, supra.* Common law actual malice has also been defined as meaning "the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference towards plaintiff's rights." *Jones v. Garner,* 250 S.C. 479, 488, 158 S.E.2d 909 (1968); *see also* Hubbard and Felix at p. 398.

Here, § 40–33–936 creates a qualified privilege. Accordingly, where a plaintiff demonstrates the defendant acted with common law actual malice, the privilege of section 40–33–936 does not apply.[8]

## 2. EVIDENCE OF MALICE

At trial and before the Court of Appeals, Hospital claimed a truthful communication made pursuant to a statutory duty could never be deemed malicious. Hospital conceded at oral

---

distinction between the two. *See* Hubbard and Felix, *The South Carolina Law of Torts,* p. 398. "Constitutional actual malice" refers to the defendant's knowledge of the publication's falsity or reckless disregard of its truth or falsity. *Id.; Sanders v. Prince,* 304 S.C. 236, 403 S.E.2d 640 (1991). The present case involves common law actual malice.

8. We remind trial judges that in cases in which the issue of punitive damages is submitted to the jury, there must be clear and convincing evidence of actual malice to warrant such an award. *See Wilhoit v. WCSC, Inc.,* 293 S.C. 34, 358 S.E.2d 397 (Ct.App.1987); S.C.Code Ann. § 15–33–135 (Supp.1996).

argument before this Court, however, that if we found a truthful report could be malicious, then the matter of the sufficiency of the evidence of malice was for the jury. Accordingly, we need not conduct an exhaustive review of the evidence to determine its sufficiency.

Malice may be proved by direct or circumstantial evidence. *Smith v. Smith,* 194 S.C. 247, 9 S.E.2d 584 (1940). Proof that statements were published in an improper and unjustified manner is sufficient evidence to submit the issue of actual malice to a jury. *Mains v. K Mart,* 297 S.C. 142, 375 S.E.2d 311 (Ct.App.1988).

Although circumstantial, there was some evidence from which the jury could infer malice. Accordingly, the issue was for the jury.[9]

### 3. DIRECTED VERDICT—ABUSE OF PROCESS

As there was some evidence from which the jury could have inferred malice, we must determine whether Hainer met her burden of proving the remaining elements of abuse of process. We find that she did not and, accordingly, affirm in result the Court of Appeals' holding that a directed verdict was properly granted on the abuse of process claim.

The essential elements of abuse of process are an ulterior purpose and a willful act in the use of the process not proper in the conduct of the proceeding. *Huggins v. Winn–Dixie Greenville, Inc.,* 249 S.C. 206, 153 S.E.2d 693 (1967). Some definite act or threat not authorized by the process or aimed at an object not legitimate in the use of the process is required. There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. *Id.; Rycroft v. Gaddy,* 281 S.C. 119, 314 S.E.2d 39 (Ct.App.1984); Hubbard & Felix, *supra* at 382–383. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself. *Id.* Abuse of process requires both an ulterior purpose and a willful act not

---

**9.** The Court of Appeals' opinion is modified to the extent it held there was no evidence of malice.

proper in the regular course of the proceeding. *See Sierra v. Skelton*, 307 S.C. 217, 414 S.E.2d 169 (Ct.App.1992).[10]

▇▇ Here, Hainer's evidence is simply insufficient to meet the elements of abuse of process. The evidence, viewed in the light most favorable to Hainer, is that several days after her resignation on July 16, 1989, she had a meeting with Hospital employees at which Hainer was advised she would "have to [be] report[ed] to the State Board of Nursing for patient abandonment." Notably, Hainer did not testify that she was "threatened" with a complaint to the Board if she did not report to work; she testified only that she was told that she would have to be reported. Hainer testified that she heard absolutely nothing more from Hospital until sometime in February, 1990, when she was contacted by the State Nursing Board concerning the complaint which had been filed against her by the Hospital.[11] There is absolutely no evidence in the record that, in between these dates, Hospital in any way threatened, coerced, harassed, or otherwise contacted Hainer.

Hainer essentially bases her abuse of process claim on the fact that, at trial, Hospital vacillated as to the date it learned "patient abandonment" was a reportable offense.[12] The argu-

---

10. There is authority for the proposition that the focus of an abuse of process claim is on the improper use of the process after it has been issued. *Scott v. McCain*, 275 S.C. 599, 274 S.E.2d 299 (1981); Hubbard & Felix, *supra* at p. 384. *But see Sierra v. Skelton, supra.* Under this view, there was clearly no willful act subsequent to issuance of the process in this case. However, we need not decide whether a claim for abuse of process will lie in cases where the willful act occurs prior to the institution of proceedings since, here, there is simply no willful act in the use of the proceedings.

11. In the interim between July and February, other nurses were allegedly "threatened" by Hospital with charges of "patient abandonment." One of those nurses, Sandra Enright, was told by Nurse Woltman that if she did not report during Hurricane Hugo, she would be reported to the Nursing Board. Enright filed suit against Hospital in November, 1989; her suit was subsequently settled.

12. According to Hospital's director of nursing, the reason for the delay in filing a complaint was that she did not learn until February 8, 1990 (in a phone conversation with B.J. Church of the Nursing Board) that "patient abandonment" was a reportable offense required by the Nurse Practice Act, S.C.Code Ann. § 40–33–935 (Supp.1995) to be reported to the State Board. It is undisputed that although "patient abandonment"

ment follows that, since it did not even know if "patient abandonment" was a reportable offense, it must have been using it as a threat against her and other nurses to "keep them in line." The problem with this argument is twofold. First, it is undisputed that, at least as to Hainer, she was told in July, 1989 that Hospital would have to report her to the Board. Second, it is uncontradicted that Hospital had absolutely no contact with Hainer between the date of that meeting and the lodging of the complaint with the Nursing Board. The fact that other nurses may have been threatened with "patient abandonment" charges, or that another nurse filed suit against Hospital in November is simply insufficient to demonstrate that Hospital abused the process against Hainer. Although Hainer's evidence may be susceptible of an inference of an ulterior purpose, i.e., that Hospital filed the report either to discredit Hainer, or to chill other nurses from testifying in the Enright suit, Hainer has simply failed to demonstrate in what manner Hospital committed a "willful act not proper in the regular conduct of the proceeding." *Huggins v. Winn–Dixie Greenville, Inc., supra. Cf. Kollodge v. State of Alaska,* 757 P.2d 1024 (Alaska 1988); *Tomash v. John Deere Industrial Equipment,* 399 N.W.2d 387 (Iowa 1987).

The only arguable "act" cited by Hainer is the fact that Hospital delayed filing its complaint with the Board for several months. However, S.C.Code Ann. § 40–33–970 sets forth no time frame in which to report misconduct and, accordingly, there is nothing improper in the fact that Hospital delayed filing its complaint. As noted by the Court of Appeals in *Skelton,* there must be an overt act, and an improper purpose alone is insufficient. 307 S.C. at 222, 414 S.E.2d at 172. *See also Huggins, supra;* W. Page Keeton, *Prosser and Keeton on The Law of Torts* 898 (5th Ed.1984). At best, the evidence here demonstrates that Hospital carried out the process to its authorized conclusion, even if it had bad intentions in so doing. This is simply insufficient to create liability under this cause of action. *Rycroft v. Gaddy, supra; Scott v. McCain,* 275 S.C. 599, 274 S.E.2d 299 (1981). Accord-

became a reportable offense in June, 1989, the regulations to that effect were not in print in July, 1989. 26 S.C.Code Regs. 91–19(c)(3)(n) (Supp.1995).

ingly, the Court of Appeals' holding on this issue is affirmed in result.

## 4. DIRECTED VERDICT—OUTRAGE

■ The only remaining issue is whether Hospital was entitled to a directed verdict on Hainer's claim of outrage. We concur with the Court of Appeals' opinion that Hospital's actions here do not rise to the level of outrage. *Cf. People v. Yarbrough*, 156 Ill.App.3d 643, 109 Ill.Dec. 86, 509 N.E.2d 747 (1987) (even if report of misconduct against nurse was filed in bad faith and with malice, it was not enough to be characterized as extreme and outrageous). Accordingly, we affirm the Court of Appeals' opinion on this issue.

**AFFIRMED IN RESULT.**

FINNEY, C.J., and MOORE and BURNETT, JJ., concur.

TOAL, J., dissents in separate opinion.

TOAL, Justice, dissenting:

I dissent, in part, because I differ with the portion of the majority's opinion which bears on the issue of abuse of process. As there was evidence of abuse of process to withstand a directed verdict motion, the trial court properly submitted the issue to the jury. Accordingly, the decision of the Court of Appeals should be reversed.

The leading South Carolina case on the issue of abuse of process is *Huggins v. Winn–Dixie Greenville, Inc.*, 249 S.C. 206, 153 S.E.2d 693 (1967). The case sets forth the following definition of abuse of process:

> The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of

coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or club.

*Huggins,* 249 S.C. at 209, 153 S.E.2d at 694.

*Huggins* applied the above-cited principles to the following facts: The plaintiff, a customer, had entered the defendant's store and had decided to buy various food items. He picked up two small packages of ham, which he dropped into his coat pocket, as he was not using a pushcart. He proceeded to the check-out counter and paid for a bottle of oil and a bag of potatoes. When he reached the door on his way out, the store manager stopped him and asked if he had forgotten to pay for the ham, whereupon he replied that he had forgotten about it, took it out of his pocket, and offered to pay for it. The manager refused the proffered payment, called him to the rear of the store, where he asked him why he had done this, to which the customer replied that he had made a mistake and was sorry that it had happened. The customer repeated his offer to pay for the ham, but the manager replied that he would have to pay ten dollars for merchandise that the manager felt the customer had previously taken from the store. When the customer refused to do so, the manager had the police called, who eventually arrested the customer and charged him with petit larceny. He was released on bond, but was subsequently arrested for shoplifting. Upon trial, he was found not guilty.

Viewing the facts in the light most favorable to the customer (i.e. the non-moving party), this Court concluded that there was evidence that "the criminal process of the court was used for the ulterior purpose of coercing the plaintiff into paying ten dollars for merchandise that the store manager 'felt' he had previously taken, rather than for the sole purpose for which it could properly have been intended, *viz.,* to punish the plaintiff for 'shoplifting' two packages of ham." *Huggins,* 249 S.C. at 212, 153 S.E.2d at 696.

As in *Huggins,* the facts of the present case also make out a claim for abuse of process. Anne Hainer was described by her co-workers as a very capable, competent nurse who worked at Hospital. On July 16, 1989, Hainer left her job,

leaving a resignation letter at Hospital. She called Hospital personnel to ensure they had received her resignation letter. She was told that she could not resign, but was fired, and that she had committed patient abandonment.

Several days later, Hainer was called to Hospital for a meeting. At the meeting, she was informed by Hospital personnel that they had to report her to the State Board of Nursing for patient abandonment; however, they offered to give Hainer back her job. Hainer stated, "I came away with the understanding that—that they had control over me." She further testified that Hospital personnel threatened her with patient abandonment.

Hainer decided against resuming her job and wrote another letter of resignation, which she mailed to Hospital in the latter part of July. She did not hear back from Hospital, and Hospital did not report her for patient abandonment at that time. Another nurse testified that Kathy Sellers, a hospital supervisor, was very angry with what had happened and "was going to go after [Hainer's] license" on the grounds of patient abandonment.

Two months after Hainer's resignation, Hospital personnel threatened another nurse, Sandra Enright, in connection with staffing needs at the time of Hurricane Hugo. Enright was called at home by her supervisor Cindy Woltman the day before Hurricane Hugo hit South Carolina and was told to report to work the next day. When Enright replied that she was planning to evacuate the area with her family and that she was not scheduled to work, Woltman told her that she would lose her license. When Enright asked on what grounds, Woltman responded, "patient abandonment." Because of the threat, Enright went to work the next day. At work, she discovered that other nurses had received similar phone calls.

Shortly after Hugo, Enright complained to Hospital personnel about her license being threatened. Additionally, she met with Woltman to express her concerns about the matter. Woltman told her that she had been instructed to do so by other Hospital personnel and that they were ignorant of the patient abandonment laws. Enright then brought up the subject of how Anne Hainer had been threatened with patient abandonment to show that Hospital was well aware of the

patient abandonment laws. Woltman said that Enright was right.

On November 22, 1989, Enright filed a lawsuit against Hospital and certain Hospital personnel in relation to the Hugo incidents. Hainer had agreed to testify in Enright's case that Hospital personnel had also threatened to report her. After the suit was filed, Enright and her attorney advised Hospital that they were aware of another employee (Anne Hainer) having been threatened by Hospital personnel for patient abandonment. They conveyed this information in March 1990. In the very same month, Hospital filed with the State Nursing Board a charge of patient abandonment against Anne Hainer. This was some eight months after Hainer's resignation.

Hainer filed the present action alleging Hospital had engaged in a pattern of intimidation of nurses by repeatedly threatening to file patient abandonment charges against them. In particular, she contends that Hospital pursued patient abandonment charges against her to prevent her from serving as a witness in the Enright lawsuit and to prevent her from disclosing Hospital's management practices. Such acts, she asserts, constitute abuse of process.

Viewed in the light most favorable to the non-moving party, the facts presented at trial offer ample evidence for Hainer's abuse of process claim to survive Hospital's directed verdict motion. Evidence was presented that Hospital was clearly aware of the charge of patient abandonment; that it threatened Hainer with this charge; and that it threatened other nurses with the same charge. The majority opinion rejects Hainer's claim for abuse of process, concluding that there was not evidence of both an ulterior purpose and a wilful act. To the contrary, evidence of both elements is present. The "ulterior purpose," taking "the form of coercion to obtain a collateral advantage," was the prevention of Hainer from revealing information about Hospital's improper management practices and from serving as a witness in the Enright's lawsuit. *See Huggins,* 249 S.C. at 209, 153 S.E.2d at 694. The "wilful act in the use of the process not proper in the regular conduct of the proceeding" was the threat to have Hainer's nursing license revoked. As *Huggins* stated, the

"wilful act" may take the form of a "threat ... aimed at an objective not legitimate in the use of the process." *See id.*

The majority asserts that there is no evidence of a wilful act because Hainer was not in any way threatened. A review of the record would indicate otherwise. The following facts amply bear this out:

1. Hospital fired Hainer and informed her she had committed patient abandonment; yet, it offered Hainer back her job.

2. Hainer testified that "Miss Sellers and Miss Condon had ... threatened to report me to the State Board of Nursing for patient abandonment."

3. Enright testified that Cindy Woltman "stated that Kathy Sellers was very angry about what happened and was going to go after Anne's license. And I asked her, 'On what grounds?' And she said, 'Patient abandonment'...."

4. Enright testified about a conversation she had with Cindy Woltman: "I said, 'You know as well as I do that they were going after Anne Hainer's license and the reason they didn't is because they couldn't because she—not only—not only did she not abandon her patients but it was ridiculous.' And the point of me bringing up Anne Hainer was the fact that the hospital had previous knowledge of the patient abandonment laws. And with that, she stated I was right and she began to cry."

5. Hospital filed charges against Hainer only after Enright and her attorney advised Hospital that Hainer had agreed to testify that Hospital personnel had also threatened to report her for patient abandonment.[1]

These facts provide persuasive circumstantial evidence that Hospital engaged in an act or threat aimed at an objective not legitimate in the use of the process. The majority opinion suggests that only direct evidence of an overt act will suffice to allow the case to be presented to the jury. This conclusion is based on two faulty notions: First, that only direct, not circumstantial, evidence is permitted in order to establish an

---

1. The majority opinion asserts that Hainer's abuse of process claim just rests on Hospital's vacillation as to the dates it learned "patient abandonment" was a reportable offense. The above-listed facts would indicate there is much more to Hainer's claim.

abuse of process claim. I am unaware of any authority for the proposition that the evidentiary rules are somehow different for abuse of process actions. Second, the majority opinion accepts the concept that an "overt act" is necessary in order to make out a claim. As far as I can determine, the mention of the necessity of an "overt act" in abuse of process cases appears for the first time in South Carolina jurisprudence in the 1992 Court of Appeals opinion *Sierra v. Skelton*, 307 S.C. 217, 414 S.E.2d 169 (Ct.App.1992). This was not a requirement in any of this Court's abuse of process decisions.[2]

If we approach the tort of abuse of process only in a hypertechnical manner, then we vitiate the purpose for which the cause of action exists. As *Huggins* explained, abuse of process is the employment of legal process for some purpose other than that which it was intended by the law to effect. *Huggins*, 249 S.C. at 210, 153 S.E.2d at 695. That case further stated that it is the "abuse, the perversion, of the process, not its illegality, [that] is the foundation of the cause of action." *Huggins*, 249 S.C. at 214, 153 S.E.2d at 697.

A reading of *Huggins* reveals that this Court employed a flexible approach to analyzing whether process had been abused. For example, in the case, the defendant argued that since the customer's arrest in the store and subsequent arrest on the warrant for shoplifting took place after the actions of the store manager, those actions did not constitute abuse of process because "process" was not then in existence. The opinion rejected this technical argument,[3] calling it "unsound" and concluding that the defendant

cannot divorce itself from responsibility for the proceedings that resulted from the store manager's action; and the testimony in this record warrants the inference that the arrest, the charge of petit larceny, and the subsequent arrest, indictment and trial on the charge of shoplifting, all of which on their face related only to two packages of ham,

---

2. *Sierra v. Skelton* should be overruled to the extent it would require an overt act for an abuse of process claim to be made out.

3. The majority opinion's discussion in footnote 10, stating there is authority for the proposition that the focus of an abuse of process claim is on the improper use of the process *after* it has been used, does not comport with the clear holding in *Huggins*.

were tainted throughout with the ulterior and improper purpose of coercing the respondent to pay for merchandise that the store manager "felt" or suspected he had previously taken.

*Huggins,* 249 S.C. at 212, 153 S.E.2d at 696.

In addition to *Huggins,* our opinion in *Broadmoor Apartments v. Horwitz,* 306 S.C. 482, 413 S.E.2d 9 (1991) also exemplifies this Court's flexible approach in analyzing abuse of process claims. In that case, Broadmoor executed a contract with a purchaser for the sale of an apartment complex. The required $75,000 deposit was reduced to $50,000 by agreement of the parties. A few months later, the purchaser requested that the deposit be further reduced to $25,000. This request was rejected by Broadmoor. The deposit was not paid; nevertheless, the purchaser purported to assign the contract of sale to a third-party. Such an assignment was not permitted under the contract. The third-party attempted to cover the deposit by issuing a $50,000 draft; however, the bank account on which the draft was drawn had a balance of $10. Subsequently, the third-party filed a lis pendens to enjoin sale of the property. The lis pendens and specific performance actions were resolved in Broadmoor's favor.

Broadmoor then sued purchaser and third-party for slander of title and abuse of process. The abuse of process action resulted in a jury verdict of $750,000. In reviewing the denial of a motion for directed verdict, this Court found that the trial court had properly submitted the abuse of process issue to the jury. We simply concluded that there was evidence "from which the jury could infer that [third-party] willfully abused the process, with the ulterior purpose of preventing a sale to [others] in hopes of obtaining financial backing with which to purchase the property at an advantageous price." *Broadmoor,* 306 S.C. at 487, 413 S.E.2d at 12. Thus, *Broadmoor* affirms the teaching of *Huggins* that "it is the malicious misuse or perversion of the process for an end not lawfully warranted by it that constitutes the tort known as abuse of process." *Huggins,* 249 S.C. at 209, 153 S.E.2d at 695.

The Restatement's formulation of abuse of process further supports the method of analysis set forth in *Huggins* and *Broadmoor.* Restatement (Second) of Torts § 682 (1977)

provides: "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." The comment to the section reveals that the gravamen of the misconduct "is the misuse of the process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish."

A fundamental purpose of the disciplinary process for nurses is the "protection of the public." *See* S.C.Code Ann. § 40–33–930 (Supp.1996). The process seeks to discipline those nurses who have not conformed to the standards of the profession. The purpose of the process is not to coerce, harass, or threaten nurses. It was not intended to serve as a "club" to be used by hospital supervisors to intimidate nurses into working when they are not required to work, to prevent nurses from disclosing information about improper hospital practices, or to scare off potential witnesses in actions against hospitals. In the instant case, there is ample evidence of a misuse or perversion of the process for an end not lawfully warranted. Accordingly, I believe the trial court did not err in denying Hospital's motion for directed verdict on this issue.

For the foregoing reasons, I dissent, in part, from the majority opinion.