22153

ROUNDTREE VILLAS ASSOCIATION, INC., Plaintiff-Respondent, v. 4701 KINGS CORPORATION, Roundtree Corporation, Inc., Miles and Teal Builders, Inc., J. B. Miles, James B. Teal, Republic Mortgage Investors, Mortgage Investments Services, Inc., and Fred B. Hallmark, Defendants, Of Whom Republic Mortgage Investors and Mortgage Investment Services, Inc., are Defendants-Appellants. Appeal of REPUBLIC MORTGAGE INVESTORS and Mortgage Investment Services, Inc.

(321 S. E. (2d) 46)

Supreme Court

*John R. Clarke*, North Myrtle Beach, *for plaintiff-respondent.*

*Larry D. Estridge*, Greenville, *for defendants-appellants Republic Mortgage Investors and Mortgage Investment Services, Inc.*

*William A. Bryan*, Lake City, *for defendant James R. Teal.*

*J. Frank Looper*, Florence, *for defendants Miles and Teal Builders, Inc.* and *J. B. Miles.*

Heard April 4, 1984.

Decided Aug. 8, 1984.

LITTLEJOHN, Chief Justice:

The Plaintiff-Respondent, Roundtree Villas Association, Inc., brought this action to recover damages against six Defendants, all of whom were involved in various ways in the construction, development, and sale of a condominium complex in Horry County. It is not a class action. A jury rendered a general verdict against two of the Defendants and they appeal. We reverse and remand for a new trial.

Identification of the parties Plaintiff and Defendants is necessary to an understanding of the issues.

Plaintiff-Respondent, Roundtree Villas Association, Inc., is a nonprofit South Carolina Corporation whose primary function is to own and administer the common elements of the condominium project called "Roundtree Villas." We will refer to this litigant as the Regime.

Defendant, Roundtree Corporation, Inc., was the original owner of a parcel of real estate which filed a deed under the Horizontal Property Act Chapter 31, Section 27-31-10 *et seq.* of the South Carolina Code. We will refer to it as the Builder.

Defendant-Appellant, Republic Mortgage Investment Services, Inc., was the financier of the project. It made a construction loan to the Builder. We will refer to it as the Lender.

Defendant-Appellant, Mortgage Investment Services, Inc., is an advisory service employed by the Lender. We will refer to it as the Lender's Advisor.

Defendant, Fred B. Hallmark, was an architect employed by the Builder with the approval of the Lender. We will refer to him as the Architect.

Defendants, Miles and Teal Builders, J. B. Miles and James R. Teal, were general contractors for the project. We will refer to them as the Contractors.

Defendant, 4701 Kings Corporation, was a company created at the instigation of the Lender to accept title to the mortgaged property in lieu of foreclosure. It undertook to sell twenty-five (of the thirty-seven) units which had not been sold when the Builder defaulted. We will refer to it as the Seller.

The Regime alleged four causes of action in its amended complaint:

(1) That the several Defendants including the Lender and the Lender's Advisor "... negligently, carelessly, recklessly and in a manner which fails to meet the minimum standard of care of developers, general contractors, architect, sellers and financial institutions performing services such as were required of them concerning the agreement as referred to hereinabove ..." committed several specified acts in the construction of the project;

(2) That the Lender, Lender's Advisor, and the Seller were negligent and reckless in certain particulars when they undertook to correct deficiencies in the construction to promote sales of the remaining units;

(3) That the Lender and the Seller breached implied and express warranties that the condominium units were fit and habitable for the purpose intended; and

(4) That the Lender and the Contractor breached an express warranty.

The defective construction for which recovery is sought as stated in the complaint is for "... repairs and/or replacement regarding the roofs and the balconies, and in regard to repairs and/or replacements which have already been made or which will in the future be made regarding interior damage to said units." The Regime sought a general verdict for actual and punitive damages.

The Builder and Architect defaulted. The Contractors were exonerated by the judge as a matter of law. The jury exoner-

ated the Seller. The jury rendered a general verdict for actual damages only without any indication as to which cause or causes of action were proved. This verdict was against only the Lender and the Lender's Advisor in the amount of $300,000 actual damages. These two defending parties are the Appellants.

The litigation is typical of many actions growing out of the depressed economy of the mid 1970's. In recent years, it has not been unusual for substantial construction undertakings to meet with financial disaster. Traditionally, as here, those parties most responsible for substantial losses cannot respond to a judgment and, accordingly, aggrieved parties seek a "deep pocket." Attempting to solve the complex issues of fact and of law is somewhat like attempting to unscramble an egg. The court strives to do justice which oftentimes must be only approximate. When justice cannot be meted out exactly, we do that which is next best — try to bring an end to the dispute.

In early 1973, the Lender, in keeping with its note and mortgage, periodically supplied funds to the Builder for construction of four separate buildings housing a total of thirty-seven condominium units. The project was completed in 1974.

The transaction involved a typical construction loan. The Lender monitored the construction project to protect its loan investment and to be assured that it was built according to plans and specifications. The Lender required the Builder to employ an engineer to inspect the project periodically and submit a written certification confirming that it had reached certain stages of completion so that the Builder could qualify for advances of proceeds from the construction loan.

Unfortunately, the project was completed at a time when money was short and real estate simply was not moving. The Builder rented some of the units but did not sell any for almost two and one-half years. In late 1976, the Lender and the Lender's Advisor became involved in trying to market the units. It was then that they learned of structural defaults in the roofs.

In early 1977, the Builder sold twelve of the thirty-seven units. As each was sold, the Lender received payment on the mortgage and in turn released the sold units from its lien. The Builder, to prevent foreclosure, deeded the remaining twenty-

five units to the Seller, 4701 Kings Corporation, which had been incorporated by the Lender. This new entity took title to not only the twenty-five units but also to the rights and common elements of the condominium project. In addition, it assumed the obligation owed by the Builder to the Lender.

At the same time, the Lender, holding a note and mortgage for almost $1,000,000, needed to do whatever it could to salvage a bad investment. 4701 Kings Corporation, Seller, was formed with nominal assets to accept title to the property subject to the mortgage and to sell the remaining units. As sales were closed, the purchase money was delivered to the Lender which in turn released the property from its mortgage lien.

The Lender about this time began to receive numerous complaints from owners of units concerning the roofs and balconies. It was to the advantage of the Lender to pacify the persons who then owned the units to create a good image and promote sales of the remaining units. Only the Lender had money of consequence tied up in this project and it was obviously calling the signals for all persons involved. To make the units more sellable, the Lender sent agents to the project to inspect the premises and employed various companies and individuals to make repairs to the roofs, to some of the balconies, and, perhaps, other items. One roofing expert recommended a plan calling for what amounted to the replacement of the four roofs. The Lender and the Lender's Advisor refused to adopt this plan because of excessive cost, approximately $110,000 to $120,000. Instead, they developed an alternate program of stopgap measures to pacify the complaining current owners and promote sales to new prospects. The Lender advanced funds to pay for many of these repairs and stopgap measures.

Before we discuss each of the four causes of action and the errors of law alleged relative to each, we reach a basic issue which requires reversal.

The Lender and the Lender's Advisor submit that the court erred (1) by refusing to dismiss all causes of action on the ground that the Regime had no standing to obtain a monetary judgment with respect to property which the Regime did not own and (2) by refusing to instruct the jury that the Regime could not recover a verdict for

damages to property that it did not own and (3) by allowing the Regime to submit evidence of such damages to the jury. The rights and authority of the Regime must be gleaned from the Horizontal Property Act and from the master deed. From these, we may determine (1) the property owned by the individual condominium owners and (2) the rights of the Regime. The Regime owns the common elements. Section 27-31-20, definitions, reads, in part, as follows:

[f] "General common elements" means and includes:

... (2) The foundations, main walls, roofs, halls, lobbies, stairways, and entrance and exit or communication ways; ...

[g] "Limited common elements" means and includes those common elements which are agreed upon by all the co-owners to be reserved for the use of a certain number of apartments to the exclusion of the other apartments, such as special corridors, stairways, elevators, sanitary services common to the apartments of a particular floor, and the like; ...

We have no trouble in finding that the roofs are common elements which must be maintained by the Regime and, accordingly, the Regime has a right to bring a cause of action as relates to roof defects. Neither the Act nor the deed imposes upon the Regime the duty to maintain balconies or the authority to bring a cause of action for alleged balcony defects. The Regime contends, in its brief, that:

The Master Deed and By-Laws make the Association responsible for the common elements. The definition in the Master Deed states that patio walls and load bearing interior walls and partitions are included in the common elements. The Respondent [Regime] considers the term "patio" to be synonymous with balcony and therefore considers the testimony concerning damages under the responsibility of the homeowners association.

We disagree with this analysis. Patio walls simply are not synonymous with balconies and balconies are not common element property. The trial judge should have held as a matter of law that the Regime had no standing to sue for damages

to property not encompassed in the term "common element." We will now discuss each of the four causes of action.

The gravamen of the Regime's contention in the first cause of action is that the Lender and the Lender's Advisor are liable for construction defects. At the appropriate times, the Lender and the Lender's Advisor moved for a directed verdict and for judgment notwithstanding the verdict as to the first cause of action. They argued that, as a matter of law, they could not be held liable for the negligent or reckless *construction* of the roofs and balconies. The trial judge overruled the motions and charged the jury, in essence, that certain Defendants, including those here appealing, could be held liable for negligent and reckless construction.

There is no applicable statutory law. This court has, however, on previous occasions in recent years imposed new duties and responsibilities upon the sellers of real estate. *E.g.*, *Lane v. Trenholm Building Company*, 267 S. C. 497, 229 S. E. (2d) 728 (1976). We have not heretofore been confronted with a case wherein the purchaser has attempted to impose liability upon a lending institution because of faulty construction. We refuse to extend such liability now.

The builder of a house is entitled to make his own contract with the construction company. In like fashion, a lending institution is entitled to make its own contract with one who is building a house. Traditionally, lenders, in making a construction loan, make periodic inspections to assure that the construction loan advancements are being applied appropriately. This is fundamentally for the protection of the lending institution and does not impose upon the lending institution a duty to see that the builder is getting a job free of defects. Both the lender and the borrower have a common interest in seeing that the construction company builds a building free of defects but absent a contract the builder has no common law duty to protect the lender and the lender has no common law duty to protect the builder. *See Butts v. Atlanta Federal Savings and Loan Association*, 152 Ga. App. 40, 262 S. E. (2d) 230 (1979) (in which the court discusses *Connor v. Western Savings and Loan Association*, 69 Cal. (2d) 850, 73 Cal. Rptr. 369, 447 P. (2d) 609 (1968) and *Bradler v. Craig*, 274 Cal. App. (2d) 466, 79 Cal. Rptr. 401 (1969) ); Annot. 39 A.L.R. (3d) 247.

The Regime in its second cause of action alleges that the Lender and the Lender's Advisor undertook to repair the roofs and did so in a negligent manner proximately causing damages. We have held hereinabove that their involvement was not such as to make them liable for negligence on the part of the Builder, Architect or Contractors. They were not active participants in the building enterprise during the initial construction and prior to 1977. We hold however that, when the Lender, in effect, took over the project and undertook to market the units through a corporation it had created and when it undertook to repair defects which existed to promote sales, a common law duty to use due care arose. Restatement (Second) of Torts § 323. On this matter there was a jury issue, but only as relates to the common elements. Under this cause of action the Lender and the Lender's Advisor may only be held liable for any damages proximately caused by the alleged negligent repair, but not for any original damages proximately caused by the negligence of the Builder, Architect or Contractor. We hold therefore that a new trial must be held, restricted to the alleged negligent repairs of common element property only. This, of course, excludes the balconies.

In the third and fourth causes of action, the Regime asserts it should recover because of a breach of either express or implied warranties or both. A warranty of either kind is, in effect, a contract. A search of the record reveals nothing that would warrant a finding that these appealing Defendants entered into any warranty agreement expressly or by implication. This is not to say that warranties did not exist, only that these particular appealing Defendants did not enter into any warranty agreements.

The trial judge erred in failing to grant a motion for a directed verdict or a motion for judgment notwithstanding the verdict as to the first, third and fourth causes of action.

In matters so complex as these herein, this court has tolerated general verdicts. We suggest, however, to the bench and bar that it would be helpful in the administration of justice, particularly on appeal, if the trial court would require the jury to enunciate more distinctly the basis of its verdict. Here, we have no way of knowing whether the verdict was based on one cause of action or a combination of

more than one cause of action or on all of the causes of actions.

In light of our ruling, it is not necessary to discuss the other issues raised on appeal.

Accordingly, the appeal is sustained and the case is remanded for a new trial in keeping with the views expressed.

Reversed and remanded.

NESS, GREGORY and HARWELL, JJ., concur.

J. WOODROW LEWIS, as Acting Associate Justice, concurs in result.