525 S.E.2d 888

WHITFIELD CONSTRUCTION COMPANY, Appellant,

v.

The BANK OF TOKYO TRUST COMPANY and Merit Realty Holding Corporation, Respondents.

No. 3068.

Court of Appeals of South Carolina.

Heard Oct. 5, 1999.

Decided Nov. 1, 1999.

Rehearing Denied Jan. 29, 2000.

Charles S. Altman, of Finkel & Altman; Morris D. Rosen, of Rosen, Goodstein & Hagood, both of Charleston; and Gilbert S. Bagnell, of Columbia, for appellant.

Harold W. Jacobs and David J. Parrish, both of Nexsen, Pruet, Jacobs, Pollard & Robinson, of Charleston, for respondents.

GOOLSBY, Judge:

Whitfield Construction Company appeals an order of the special referee dismissing its action against The Bank of Tokyo Trust Company and Merit Realty Holding Corporation (collectively referred to as BOTT) and awarding BOTT actual damages, punitive damages, and attorney fees on its counterclaims for abuse of process and for violation of the South Carolina Frivolous Civil Proceedings Sanctions Act. We affirm in part and reverse in part.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

This litigation arises from the sale and option of a 231–acre tract of land in North Charleston, South Carolina. The property was owned by Whitfield Construction Company and Floyd Whitfield,[1] the company's general partner.

In early 1987, Lincoln Developers and related entities (the Developer) investigated the feasibility of purchasing and developing Whitfield's property, along with an adjoining 18–acre plot owned by a third party, Kenneth Willard. Whitfield's property consisted of Tracts A, C, F, and G, and Willard's property consisted of Tract E. The combined properties, totaling 249 acres, are bounded on two sides by Ashley Phosphate and Dorchester Roads.

---

1. The name "Whitfield" is used interchangeably to refer to both Floyd Whitfield and Whitfield Construction Company.

The Developer had a site plan prepared for the entire 249 acres. The Developer intended, as the initial phase of development, to construct a shopping center on Tracts A and E.

In July 1987, the Developer entered into a purchase-option agreement with Whitfield to purchase Tracts A and C, with Tract A being expanded to include the roadbed for the proposed Lincoln Boulevard. The proposed roadway, which was designed to provide principal access to the property, was to extend from Ashley Phosphate Road along the northern boundary of Tract A, which adjoins Tract G, through Tract F and terminate at Dorchester Road. The agreement further provided the Developer a five-year option to purchase Tracts F and G, which together contained 168 acres.

In anticipation of ultimately purchasing and developing the optioned property, the Developer planned to install an infrastructure of roads, utilities, and drainage throughout the entire 249–acre tract. To this end, the purchase-option agreement provided:

> Buyer, his agents, employees, or contractors shall have the right to enter upon the premises for the purpose of clearing trees, foliage, and other debris, to perform excavating work for storm water management and to take boring samples, make compaction, percolation, or other studies deemed necessary by Buyer. It is further understood that any such work shall be performed in such a manner as to ensure that there is no diminution in value to any of the Seller's property.... Buyer's rights hereunder shall include the right to install all utilities in accordance with plans and specifications to be prepared by Forsberg Surveying and Engineering and Seller will provide all easements required for such purposes.

The Developer retained Forsberg Engineering and Surveying, Inc., to prepare plans and specifications for the envisioned infrastructure. The Developer then purchased Tract E from Willard in August 1987 and tracts A and C from Whitfield in October 1987.

At the time the parties executed the purchase-option agreement, rainfall runoff from offsite acres and from Tract F drained through a series of ditches and wetlands onto and through Tracts A and E and through a culvert under Ashley

Phosphate Road, where it emptied into the Ashley River. Pursuant to an easement Whitfield had previously obtained from Willard, a portion of Tract G drained through a ditch situated alongside Tract E. In order to fully develop the property, Tracts A and E had to be built up and drainage from the offsite acreage and Tracts A and E had to be rerouted. Forsberg Engineering therefore designed a series of detention ponds connected by underground pipes from the upper boundary of Tract F down to the culvert under Ashley Phosphate Road. The design plans included an eight-acre detention pond situated partially on Tract E, which was owned by the Developer, but mostly on the adjoining Tract F, which belonged to Whitfield but was under option to the Developer. The detention pond was to be used to control surface water runoff from the culvert under Ashley Phosphate Road. The plan also called for the excavated material from the detention pond to be used as foundation material for Tracts A and E. During the time Forsberg Engineering was designing the infrastructure, Whitfield attended at least two conferences during which the site plans revealing the location of the detention pond were discussed.

Using its own resources, the Developer began excavating the detention pond in 1987. During the excavation, which continued throughout the spring of 1988, Whitfield regularly visited the site, reviewed construction drawings, and guided the Developer's project manager and grading contractor on the use of some of the excavation material.

In January 1988, the Developer obtained a $20,000,000.00 loan from BOTT for construction of the shopping center. As security for the loan, the Developer mortgaged Tracts A and E to BOTT. The loan documents for the project required the Developer to construct the shopping mall according to plans approved by BOTT. In addition, BOTT retained a construction consultant, Construction Analysis Systems, Inc. (CASI), to monitor construction of the project and submit monthly inspection reports. The funds from the loan, however, were to be used solely for construction of the shopping center on Tracts A and E; none of the loan funds were designated for use in installing the infrastructure on the optioned property. In fact, installation of the stormwater drainage system, sewer

and water lines, and detention pond had been substantially completed when the Developer obtained the loan from BOTT.

During installation of the drainage system, the Developer also installed sewer lines, water lines, and roadways, and cut and graded throughout the 249–acre tract. In June 1988, the Developer conveyed the completed sewer system to Dorchester County. In February 1989, the Developer conveyed the completed water system, which parallels the sewer lines throughout the entire tract, to the Commissioner of Public Works for the City of Charleston. To facilitate the conveyance of the water system, both the Developer and Whitfield granted the City easements through the purchased and optioned properties. As well, for purposes of dedicating roadways constructed on the optioned property to the public, Whitfield signed three plats, one of which shows the boundaries of the detention pond extending onto Tract F.

From the time of the execution of the purchase-option agreement until October 1988, the Developer made monthly option payments of $23,770.00 to Whitfield. Sometime later, however, the Developer began experiencing financial difficulties and discontinued the option payments. As a result, the Developer never exercised its option to purchase Tracts F and G and Whitfield retained title to this property. In 1989, the Developer defaulted on its loan agreement with BOTT. Thereafter, Festival Center Associates (Festival) assumed the note and mortgage and became owner of the shopping center property.

During construction of the shopping center, the Developer paved a portion of Lincoln Boulevard. Because of financial difficulties, however, neither the Developer nor Festival completely paved the roadbed, and the roadbed was therefore never open to the public. Because the Developer did not purchase the optioned property, Whitfield was left with ownership of Tracts F and G, with Tract G bisected by an unpaved and abandoned roadway.

To remedy the situation, Whitfield approached Festival with a proposal that he would purchase from Festival a two-acre outparcel of wetlands located on the shopping center property. Festival agreed to sell the property to Whitfield for $40,-000.00, with the understanding that Festival would apply the

proceeds from the sale to the cost of paving the unpaved portion of Lincoln Boulevard. Whitfield would then sell the filled wetlands outparcel and likewise apply the proceeds to the balance of the cost of paving Lincoln Boulevard. In furtherance of this plan, Whitfield obtained approval from the Army Corps of Engineers to fill the wetlands by agreeing in mitigation to enlarge several other wetlands situated on Tracts F and G.

Months later, however, a contract was drafted whereby Whitfield proposed he would pay $90,000.00 for the outparcel and Festival would pay all the paving costs. By increasing the cost of the lot to him, Whitfield would receive an enhanced basis in the property, thus decreasing the tax liability he would incur when he eventually sold it. This new arrangement would also decrease Whitfield's share of the paving costs. Conversely, however, the increase in the purchase price of the outparcel would increase Festival's tax liability on the sale. In addition, because the proposed contract required Festival to apply the sales proceeds to a capital expenditure, *i.e* ., the costs of paving Lincoln Boulevard, it would have to depreciate the investment over the life of the road, thus leaving it with substantial income subject to taxation without compensating revenue.

The parties were unable to finalize negotiations, and Festival eventually defaulted on its loan agreement with BOTT. In July 1991, BOTT foreclosed on Tracts A and E and assigned its foreclosure rights to Merit Realty Holding Company.

In October 1991, Whitfield called Brian Doran, BOTT's New York counsel. According to Doran, Whitfield first asked him whether BOTT knew that stormwater was draining from the foreclosed property onto Whitfield's property and, after Doran was unable to give a definite answer, inquired if Doran was aware of the proposed agreement with Festival. Doran contacted BOTT about the prospective sale of the wetlands outparcel to Whitfield, but BOTT indicated it had no interest in consummating the deal. Whitfield continued to call Doran for about six months to inquire whether BOTT would complete the transaction. Doran answered BOTT was not interested. Around the middle of 1992, when Doran told Whitfield BOTT was unwilling to complete a transaction to which it was not a

party, Whitfield informed Doran that "he [Whitfield] might be forced to plug up the retention pond to prevent storm water from coming over from the Festival property onto the lake property. And if that didn't get the bank's attention, he might have to hire a lawyer and commence litigation."

Whitfield then contacted Daniel Forsberg of Forsberg Engineering to determine whether or not the Developer or Festival had obtained a sewer easement for the line crossing his property. Upon learning that no such easement could be located, Whitfield told Forsberg that Festival had reneged on the agreement concerning the outparcel and "he was going to get a lawyer and get those old boys' attention."

Whitfield filed this action September 9, 1992, alleging the Developer, with BOTT's knowledge and consent: (1) had negligently and recklessly destroyed the drainage easement located on Tract E; (2) had committed trespass by installing sewer lines and constructing the detention pond on Whitfield's property without Whitfield's knowledge or consent; (3) had converted materials excavated from the detention pond to construct the foundation of the shopping center; and (4) had committed a continuing trespass by collecting surface water runoff from the shopping center and diverting it in a concentrated form into the detention pond. BOTT's answer, filed December 17, 1992, alleged general denials and several defenses, namely: (1) failure to state a cause of action; (2) failure to join the necessary parties; (3) intervening, superseding cause; (4) failure to mitigate damages; (5) laches; and (6) estoppel. On April 28, 1994, BOTT moved to amend its answer to add a counterclaim for unjust enrichment based on its theory that Whitfield benefitted in various ways from the development of the shopping center. By order dated June 9, 1994, the circuit court permitted the amendment.

BOTT and Whitfield filed cross-motions for summary judgment, and both motions were heard on August 29, 1995. The circuit court declined to grant either motion for summary judgment, and the parties later consented to have the case referred with finality to the special referee.

On April 26, 1996, BOTT again moved to amend its pleadings, this time to include the statute of limitations as a defense and adding a counterclaim for abuse of process. In the abuse

of process counterclaim, BOTT asserted Whitfield filed suit in an attempt to coerce BOTT into paving Lincoln Boulevard. Over Whitfield's objection, the special referee allowed the amendment.

The special referee held the merits hearing on July 22–24, 1996. Before the special referee took testimony, Whitfield moved, among other things, to strike BOTT's counterclaims because of BOTT's refusal to respond to a discovery request for an admission that, during settlement negotiations, Whitfield refused an offer by BOTT to pave Lincoln Boulevard. In response to the motion, BOTT stipulated its proof on the counterclaim for abuse of process would not involve anything that took place after the start of the lawsuit.

In addition, Whitfield abandoned all his causes of action except for those concerning the location of the detention pond and the runoff of water from the shopping center into the pond. BOTT abandoned its counterclaim for unjust enrichment and, at the close of trial, amended its answer to include a counterclaim for attorney fees and costs under the South Carolina Frivolous Civil Proceedings Sanctions Act.

Toward the end of the trial, Whitfield moved to strike the counterclaim for abuse of process. This time, however, Whitfield's motion was based on the expiration of the statute of limitations. In response to this motion, counsel for BOTT stated only that he made the decision to bring the counterclaim because of representations made by Daniel Forsberg during the prior year.

By order dated December 6, 1996, the special referee dismissed Whitfield's claims, finding BOTT, as the construction lender and owner by foreclosure, was not responsible for the detention pond or liable for any continuing trespass on Whitfield's property. Moreover, the special referee found that, pursuant to the terms of the purchase-option agreement: (1) Whitfield had expressly and impliedly granted the Developer an easement to construct the detention pond on the optioned property; (2) Whitfield's claims were barred by the doctrine of laches; and (3) Whitfield's claims were barred by the doctrine of estoppel.

Based on these findings, the special referee held BOTT was entitled to recover $240,000.00 in actual damages and $480,-

000.00 in punitive damages for abuse of process, as well as $240,000.00 in attorney fees for its counterclaim under the South Carolina Frivolous Civil Proceedings Sanctions Act. The special referee then awarded BOTT judgment of $240,000.00 in actual damages and attorney fees and $480,000.00 in punitive damages. After granting Whitfield a hearing on the attorney fees awarded under the Frivolous Civil Proceedings Sanctions Act, the special referee granted BOTT judgment for additional attorney fees and costs under the Act in the amount of $286,463.32. As to Whitfield's argument that the statute of limitations had run on BOTT's counterclaim for abuse of process, the special referee held BOTT's amendment to add this counterclaim related back to the date of its original pleadings.

## DISCUSSION

I. Trespass Claims

■ On appeal, Whitfield argues the special referee erred in dismissing the trespass claims against BOTT. In support of this argument, Whitfield contends: (1) BOTT, through its loan documents and CASI inspection reports, knowingly required the Developer to construct the detention pond on Whitfield's property and (2) BOTT, as successor owner by way of foreclosure, continued to enjoy the benefits of the drainage pit on Whitfield's property without paying for it. We disagree.

■ Generally, a construction lender is not responsible for the torts of the borrower unless the lender is involved in, or exercises control over, construction to an extent that exceeds the degree of involvement normally expected of a commercial lender.[2]

---

2. *See Kennedy v. Columbia Lumber and Mfg. Co.*, 299 S.C. 335, 340, 384 S.E.2d 730, 734 (1989) ("Liability may ... attach when the lender becomes highly involved with construction in a manner that is not normal commercial practice for a lender."); *Roundtree Villas Ass'n v. 4701 Kings Corp.*, 282 S.C. 415, 423, 321 S.E.2d 46, 51 (1984) (holding a lender liable because the lender in effect "took over" a construction project and "undertook to market the units through a corporation it had created" and "when it undertook to repair defects which existed to promote sales, a common law duty to use due care arose"); *cf. Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club*, 310 S.C. 132, 425 S.E.2d 764 (Ct.App.1992) (refusing to hold a lender liable for

Here, the record is devoid of any evidence suggesting BOTT exercised excessive control over the Developer's offsite construction activities. Excavation of the detention pond had already commenced and was substantially underway when the Developer obtained the loan from BOTT. The Developer did not use any of the loan funds to complete the excavation. Moreover, the terms of the loan documents did not impose any new conditions concerning the Developer's offsite activities, but related solely to the development of the shopping center site and simply required the Developer to follow the plans and specifications it had submitted to BOTT to obtain the loan. Imposing such a requirement is a typical lender practice that alone will not subject the lender to liability as a co-developer. Indeed, even the inclusion of the right on the part of the lender to approve changes in construction suggests only the potential for control. Absent the actual exercise of such control, the lender does not subject itself to liability.[3]

Moreover, BOTT's act of hiring CASI to monitor construction does not exceed the degree of involvement normally expected of a commercial lender. The supreme court has expressly characterized such activity as a typical lender practice.[4]

■ Whitfield further contends BOTT is liable for its own continued trespass from 1991, when BOTT foreclosed on the

the actions of its borrower under the instrumentality or alter-ego theory because the lender did not totally dominate the activities of the borrower or engage in conduct resulting in inequitable consequences).

3. *Cf. Atlanta Skin & Cancer Clinic v. Hallmark Gen. Partners,* 320 S.C. 113, 463 S.E.2d 600 (1995) (holding a lender cannot be held liable as a control person under the state Uniform Securities Act unless the plaintiff establishes the lender actually participated in and exercised control over the borrower's operations).

4. In *Roundtree,* 282 S.C. at 419, 321 S.E.2d at 48–49, the supreme court stated:

The transaction involved a typical construction loan. The Lender monitored the construction project to protect its loan investment and to be assured that it was built according to plans and specifications. The Lender required the Builder to employ an engineer to inspect the project periodically and submit a written certification confirming that it had reached certain stages of completion so that the Builder could qualify for advances of proceeds from the construction loan.

shopping center property, until 1996, when it sold the property. We disagree.

Assuming without deciding that a trespass to Whitfield's land occurred, the act constituting the trespass was completed before BOTT acquired Tracts A and E by foreclosure. The location of the detention pond is permanent. The comprehensive drainage system has been approved by both county and municipal authorities and cannot be changed without their authorization. The system controls drainage not only from the shopping center site, but also from portions of the formerly optioned property and about 150 acres of offsite property. Furthermore, the detention pond may be classified as a wetland, for which alterations cannot be made without consulting the Army Corps of Engineers. After acquiring the land, BOTT could not simply "undo" the alleged trespass.[5]

Because we hold the special referee properly determined BOTT did not incur liability for the alleged trespass through either its role as lender or its status as subsequent owner by foreclosure, we decline to address the special referee's findings concerning the grant of an easement and the applicability of the doctrines of laches and estoppel.

In addition, we do not address Whitfield's arguments concerning the exception to the common enemy rule and the allegedly gratuitous benefit BOTT has received from the use of the drainage pit. The special referee did not rule on either of these arguments, and, as far as we can tell, Whitfield did not raise them in any post-trial motion.[6]

---

5. *Cf. Town of Troy v. Cheshire R.R. Co.*, 23 N.H. 83, 102–03 (1851) ("[I]f ... a dam, is in its nature of a permanent character, and from its nature must continue permanently to affect the value of the land flowed, then the entire injury is at once occasioned by the wrongful act and may be at once recovered in damages."); Dan B. Dobbs, *Handbook on the Law of Remedies* § 5.4 at 336 (1973) (stating that if an embankment that periodically causes rainwater to back up onto the plaintiff's land "is deemed permanent, then the plaintiff whose land is periodically flooded by it will recover in one suit not only for past damages but also for prospective damages that may occur as a result of future floodings").

6. *See Noisette v. Ismail*, 304 S.C. 56, 403 S.E.2d 122 (1991) (holding that when the trial court does not explicitly rule on a question and the appellant fails to move under Rule 59(e), SCRCP, to amend or alter the

## II. Award Under the South Carolina Frivolous Civil Proceedings Sanctions Act

 Whitfield also asserts BOTT's failure to obtain summary judgment bars recovery under the South Carolina Frivolous Civil Proceedings Sanctions Act.[7] We agree.

The Act, provides, in part, as follows:

**Liability for attorney's fees and costs of frivolous suits.**

Any person who takes part in the procurement, initiation, continuation, or defense of any civil proceeding is subject to being assessed for payment of all or a portion of the attorney's fees and court costs of the other party if:

 (1) he does so primarily for a purpose other than that of securing the proper discovery, joinder of parties, or adjudication of the claim upon which the proceedings are based; and

 (2) the proceedings have terminated in favor of the person seeking an assessment of the fees and costs.[8]

The Act also provides, however, that a party "must be considered to have acted to secure a proper purpose ... if he reasonably believes in the existence of facts upon which his claim is based" and "(1) reasonably believes under the facts that his claim may be valid under existing or developing law, or (2) relies upon the advice of counsel, sought in good faith and given after full disclosure of all facts within his knowledge." [9]

The special referee concluded Whitfield's primary purpose in instituting and continuing these proceedings was not to obtain the relief sought in the complaint, but to coerce BOTT into conveying a wetland outparcel and paving Lincoln Boulevard. The special referee also found Whitfield's allegations concerning the Developer's installation of the sewer lines, use

---

judgment on that ground, the issue is not properly before the court of appeals).

7. S.C.Code Ann. § 15–36–10 to –50 (Supp.1998).

8. *Id.* § 15–36–10.

9. *Id.* § 15–36–20.

of the fill dirt from the pond, and alleged interference with an easement were without merit.

Previously, however, at the hearing on the parties' cross-motions for summary judgment, the circuit court had declined to issue a ruling from the bench and requested counsel to submit proposed orders. It appears the parties later agreed to have the case referred to the special referee for a full merits hearing and did not pursue their respective motions. As a result, the circuit court apparently never issued an order on the summary judgment motions.

Whitfield contends that, because BOTT's summary judgment motion was not successful, his claims cannot be deemed frivolous within the meaning of the Act. We agree.

In *Hanahan v. Simpson*,[10] which was decided after the trial of this case, the supreme court acknowledged "a split of authority [among other jurisdictions] as to whether sanctions may be awarded under Frivolous Proceedings acts notwithstanding the denial of summary judgment."[11] In that case, the supreme court concurred with the view "that a party who survives pre-trial motions to dismiss and for summary judgment [is] not subject to sanctions under the Act after a trial on the surviving claims" even though that party did not prevail on those issues at the merits hearing.[12] The supreme court further reasoned "[i]t is simply untenable to suggest that, notwithstanding the trial court was convinced the issue was one for the jury, Hanahan [the nonprevailing party at trial] did not reasonably believe in the existence of her claim."[13]

BOTT argues *Hanahan* does not preclude an award of attorney fees in this case because here the circuit court did not issue a written order denying its motion for summary judgment. The absence of a written order, however, is not dispositive of the issue. *Hanahan* requires only that claims "survive" a motion for summary judgment in order to preclude attorney fees under the Act. Without question, Whitfield's

---

10. 326 S.C. 140, 485 S.E.2d 903 (1997).

11. *Id.* at 157, 485 S.E.2d at 912.

12. *Id.*

13. *Id.* at 158, 485 S.E.2d at 912–13.

causes of action "survived" BOTT's summary judgment motion in that the case was referred to the special referee for a full merits hearing.

BOTT also alleges this case is distinguishable from *Hanahan* in that Whitfield presented no independent evidence upon which he could reasonably base a belief that his claims were valid. We disagree. The supreme court unequivocally rejected the line of authority holding that "the denial of a directed verdict or summary judgment motion does not preclude a later determination that the plaintiff's claims were frivolous and groundless."[14] Although the supreme court noted with approval that the nonprevailing party in *Hanahan* had "clearly submitted evidence supporting her claims,"[15] this was merely an additional factor showing that she had pursued her claims to secure a proper purpose.[16] Nowhere in the opinion does the supreme court suggest that, in the absence of such evidence, the theory "that if a case is submitted to the jury, it cannot be deemed frivolous"[17] would not apply.

Adhering to the holding in *Hanahan*, we therefore reverse the sanctions awarded under the South Carolina Frivolous Civil Proceedings Sanctions Act. We decline to address Whitfield's other exceptions concerning the award of attorney fees under the Act.

## III. Abuse of Process and the Statute of Limitations

█ Whitfield contends the evidence does not support a finding that his actions amounted to an abuse of process. He further argues the statute of limitations bars BOTT's counter-

---

14. *Id.* at 157, 485 S.E.2d at 912.

15. *Id.* at 157–58, 485 S.E.2d at 912.

16. Moreover, in declining to grant either side summary judgment and advising the parties to attempt the settle the matter, the circuit court made the following comments: "I'm not convinced that this case is right for summary judgment after hearing all the potential issues that you have in it.... If you look at all the—the totality of everything that's gone on, there are plenty of opportunities for everybody to have known, both [sides] know what's going on.... Nobody comes into this with clean hands. There's no exact black and white, we're over here; we're over here."

17. *Hanahan*, 326 S.C. at 157, 485 S.E.2d at 912.

claim for abuse of process. We agree with Whitfield that BOTT's counterclaim for abuse of process is time-barred and do not reach the merits of this cause of action.

On April 26, 1996, more than three years after this lawsuit began, BOTT sought leave to amend its pleadings to add a counterclaim for abuse of process. At the final hearing, before the special referee took testimony, BOTT, apparently for strategic reasons, announced that proof of its counterclaim for abuse of process was not based on the settlement negotiations or anything that took place after the litigation began.

At the close of the evidence, Whitfield moved to dismiss BOTT's counterclaim for abuse of process on the ground that it was untimely.[18] In the appealed order, the special referee held the amendment to add BOTT's counterclaim for abuse of process "relate[d] back to the date of the original pleadings in 1992" because it "ar[ose] out of the filing of this litigation." We agree with Whitfield, however, that the amendment did not relate back to any of BOTT's prior pleadings.

An amendment to a pleading relates back to the date of the original pleading "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence *set forth or attempted to be set forth* in the original pleadings."[19] The central requirement here is that the party defending against the new claim have sufficient notice of it, *i.e.,* "the new claim must be 'logically related' to the *matters originally pleaded* so that the defendant is not prejudiced by the new claim asserted after the statute of limitations has

---

**18.** *See* S.C.Code Ann. 15–3–530(5) (Supp.1998) (providing for a three-year limitations period for the commencement of "an action for any injury to the person or to rights of another, not arising on contract and not enumerated by law").

**19.** Rule 15(c), SCRCP (emphasis added). In *Thomas v. Grayson*, 318 S.C. 82, 88, 456 S.E.2d 377, 380 (1995), the supreme court specifically addressed the question of when Rule 15(c) enables a party to avoid the statute of limitations, stating:

> The test to be used in determining whether or not an amendment should be allowed to relate back under Rule 15(c) to the date of the original pleading to avoid the statute of limitations, is found in the language of the Rule; specifically, whether the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth in the original pleading.

expired." [20] In federal practice, the factors to determine whether or not a claim arose out of the same conduct, transaction, or occurrence set forth in the original pleading include: (1) whether the party defending against the new claim had notice of it; (2) whether the party seeking to add the new claim will rely on the same kind of evidence offered in support of the original claim to prove the new claim; and (3) whether unfair surprise to the defending party would result if the amendment were to relate back.[21]

■ Abuse of process has been defined as " 'the employment of legal process for some purpose other than that [for] which it was intended by the law to effect—the improper use of a regularly issued process.' " [22] The elements of abuse of process are "an ulterior purpose and a willful act in the use of the process not proper in the regular course of the proceeding." [23] Furthermore, "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself." [24]

As the special referee held, Whitfield's act of filing the complaint for this lawsuit may well have been the basis for BOTT's counterclaim for abuse of process. The proper inquiry, however, is whether BOTT had ever provided notice in any of its prior pleadings that it intended to allege such a counterclaim, not whether Whitfield should have anticipated that the counterclaim would follow as a result of his own actions. In its first responsive pleading, BOTT averred only general denials and certain defenses. BOTT's first amended answer and counterclaim added a counterclaim for unjust enrichment and requested a set-off, but was otherwise substantially simi-

---

20. James F. Flanagan, *South Carolina Civil Procedure* 127 (2d ed.1996) (emphasis added).

21. 3 James Wm. Moore, *Moore's Federal Practice* § 15.19[2] (Daniel R. Coquillette et al. eds., 3d ed.1999).

22. *Huggins v. Winn–Dixie Greenville, Inc.*, 249 S.C. 206, 210, 153 S.E.2d 693, 695 (1967) (quoting 34 Am.Jur. *Malicious Prosecution* § 3, at 704).

23. *Hainer v. American Med. Int'l, Inc.*, 328 S.C. 128, 136–37, 492 S.E.2d 103, 107 (1997).

24. *Id.* at 136, 492 S.E.2d at 107.

lar to its earlier pleading. Nowhere in either pleading did BOTT even remotely suggest Whitfield made an improper use of a process to gain a collateral advantage. Without any indication in its prior responsive pleadings that Whitfield was to defend against such an allegation, we fail to see how BOTT had set forth, or even attempted to set forth, the conduct, transaction, or occurrence giving rise to a counterclaim for abuse of process. The special referee, then, erred in concluding BOTT's counterclaim for abuse of process related back to the filing date of any of its prior pleadings.[25]

There seems to be no serious dispute that BOTT knew or should have known it had a cause of action for abuse of process when the complaint for this action was filed.[26] The question of whether the amendment resulted in actual prejudice to Whitfield is not a factor in determining whether the counterclaim is barred by the statute of limitations. Either it

---

**25.** At oral argument, counsel for BOTT cited the fourth circuit case of *Burlington Industries v. Milliken & Co.*, 690 F.2d 380 (4th Cir.1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983), for the proposition that the institution of a lawsuit tolls or suspends the running of the statute of limitations on a compulsory counterclaim. In our view, however, that case is distinguishable in that it appears to concern only the assertion of a counterclaim in the initial responsive pleadings rather than an attempt to add a counterclaim by amendment. In our view, the more apt rule for the present case is set forth in *Banco Para el Comercio Exterior de Cuba v. First National City Bank*, 744 F.2d 237 (2d Cir.1984). There, the second circuit court of appeals, in holding an amendment to include a counterclaim for a setoff related back to the date of a prior responsive pleading, stated:

> "To view [Rules 13(f) and 15] as mutually exclusive makes little sense . . . in light of the express reference in Rule 13(f) to adding the omitted counterclaim *"by amendment."* The better approach . . . is to construe both rules together so that Rule 13(f) supplements the general provisions of Rule 15 by setting forth a particular standard for allowing the late assertion of omitted counterclaims. Once the standard set forth in Rule 13(f) is satisfied and leave of court to set up the omitted counterclaim is granted, the remaining provisions of Rule 15 should be fully applicable and the amendment should relate back *if it meets the test provided by Rule 15(c)."*

*Id.* at 243 (quoting Charles Alan Wright et al., *Federal Practice and Procedure* § 1430, at 159–60 (1971) (brackets, ellipses, and first emphasis in original; second emphasis added; footnote omitted in original)).

**26.** Doran testified that, as early as 1991, he believed Whitfield was engaging in abuse of process and that this opinion was "crystallized" when the litigation commenced in September 1992.

is or it isn't.[27] Because BOTT did not assert its counterclaim until after the expiration of the statute of limitations, we reverse the special referee's awards of actual and punitive damages to BOTT for abuse of process.

**AFFIRMED IN PART, REVERSED IN PART.**

CONNOR and ANDERSON, JJ., concur.

---

**27.** *See Amaker v. New,* 33 S.C. 28, 34, 11 S.E. 386, 387 (1890) (stating a statute of limitations is "a statute of repose, ... founded on motives of public policy" and "after the lapse of a prescribed time, *fixed arbitrarily,* ... the doors of the court are no longer open to him for the enforcement of a claim which he has neglected to assert within the prescribed time") (emphasis added); *Moates v. Bobb,* 322 S.C. 172, 176, 470 S.E.2d 402, 404 (Ct.App.1996) (stating statutes of limitations "are not simply technicalities" and serve to "stimulate activity, punish negligence, and promote repose by giving security and stability to human affairs"); 54 C.J.S. *Limitation of Actions* § 4 at 20 (1987) (stating "[l]imitation is not merely a presumption" but "a rule of law").