590 S.E.2d 36

Theodore H. KIRKMAN and Karen K. Kirkman, Appellants,

v.

PAREX, INC.; Francis Coaxum, d/b/a Coaxum Stucco; R.E. Miller, Miller Housing, Inc., and Miller Development Group; and First Union National Bank of South Carolina, Defendants,

of Whom FIRST UNION NATIONAL BANK OF SOUTH CAROLINA is, Respondent.

No. 3709.

Court of Appeals of South Carolina.

Submitted Oct. 6, 2003.
Decided Dec. 8, 2003.
Rehearing Denied Feb. 20, 2004.

526

John D. Kassel and William D. Robertson, III, both of Columbia, for Appellants.

Thomas E. Lydon, of Columbia, for Respondent.

KITTREDGE, J.:

Pursuant to cross-motions for summary judgment, the trial court determined that First Union, as a lender, did not impliedly warrant the habitability of Ted and Karen Kirkman's house. Summary judgment was granted in favor of First Union and the Kirkmans appeal. We affirm.

## FACTS

In 1989, Miller Housing began the construction of a house for speculative sale in Mt. Pleasant, South Carolina. Miller

Housing financed the construction through South Carolina Federal, predecessor to First Union.[1] Notwithstanding financial difficulties, Miller Housing substantially completed the house by early 1991. The Kirkmans desired to purchase the property from Miller Housing in April 1991, but the property was in foreclosure. The Kirkmans agreed to a purchase price of $232,900. The foreclosure action determined that Miller Housing's indebtedness to First Union amounted to approximately $205,000.

The Kirkmans, Miller Housing and First Union initially agreed that First Union would not conclude the foreclosure. Other liens, however, necessitated foreclosure, and, with the parties' consent, the property was deeded to First Union in May 1991. It was further agreed that Miller Housing would complete construction. Miller Housing failed to do so. First Union, in an effort to mitigate its losses, hired Building Services of Charleston to complete construction, at a cost of $40,000 to $50,000. Building Services of Charleston's work included, among other things, installation of compressors and air handlers, but it did *not* include any aspect of the artificial stucco siding which is the subject of this suit. The artificial stucco siding was installed during Miller Housing's involvement, well prior to First Union's involvement. The house was completed and the Kirkmans took possession of the property in July of 1991.

In 1999, the Kirkmans were pursuing the sale of the property and discovered moisture damage in the stucco siding. After repairing the damage and selling the house, the Kirkmans filed suit against Miller Housing, the installer of the stucco, the manufacturer of the stucco and First Union. All claims have been resolved through default or settlement except the implied warranty of habitability against First Union.

## STANDARD OF REVIEW

"Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Rule 56, SCRCP; *South Carolina Prop. & Cas. Guar. Ass'n. v. Yensen*, 345 S.C. 512,

---

1. For simplification we collectively refer to South Carolina Federal and its successor, First Union, as "First Union."

518, 548 S.E.2d 880, 883 (Ct.App.2001). Here, there are no material facts in dispute. Thus, in light of the uncontested factual record, the dispositive question before the court is one of law.

## LAW/ANALYSIS

The Kirkmans contend the trial court erred in finding First Union was not liable under an implied warranty of habitability. They maintain First Union was "substantially involved" in completing construction on the house. The Kirkmans also assert that it was not necessary for First Union to have been involved in the installation of the stucco for it to be liable under an implied warranty of habitability. We find First Union was a mere lender protecting its interest and should not be held responsible under an implied warranty of habitability.

A warranty of habitability springs from the sale of a home. *See Lane v. Trenholm Bldg. Co.*, 267 S.C. 497, 500, 229 S.E.2d 728, 729 (1976). The warranty is grounded in the doctrine of caveat venditor. In *Lane*, the court found "[t]he law should not orphan the purchaser of a house, who has likely invested his life savings ... by operation of the doctrine of [c]aveat emptor." *Id.* at 503, 229 S.E.2d at 731. It further wrote that a seller's "liability is not founded upon fault, but because it has profited by receiving a fair price and, as between it and an innocent purchaser, the innocent purchaser should be protected from latent defects." *Id.*

Our supreme court has established that public policy disfavors imposing an implied warranty of habitability on a mere lender. *See Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 340, 384 S.E.2d 730, 734 (1989). The court concluded that imposition of liability on mere lenders would be burdensome and would discourage lending in the state. *Id.* Additionally, the court held: "[I]t is unduly punitive to impose potential warranty liability on a lender that is searching for some way to recover the losses it has suffered due to the default of the debtor." *Id.* This court, following the *Kennedy* precedent, noted that "a construction lender is not responsible for the torts of the borrower unless the lender is involved in, or exercises control over, construction to an extent that exceeds the degree of involvement normally expected of a commercial

lender." *Whitfield Constr. Co. v. Bank of Tokyo Trust Co.,*
338 S.C. 207, 216, 525 S.E.2d 888, 893 (Ct.App.1999).

In *Roundtree Villas Ass'n, Inc. v. 4701 Kings Corporation,*
282 S.C. 415, 321 S.E.2d 46 (1984), the court found a lender
was not liable for defects in construction which was completed
prior to it undertaking repairs to several units. While the
lender monitored the construction, this did not create a duty
to prevent defects. *Id.* at 422, 321 S.E.2d at 50. Conversely,
*Roundtree Villas* permitted liability against the lender when
"it undertook to repair defects . . . [and] took over the project
and undertook to market the units through a corporation it
had created." *Id.* at 423, 321 S.E.2d at 51.

■ A lender, however, may be held liable under the theory
of an implied warranty of habitability when its functions as a
lender are secondary to its function as a developer. *See Lane,*
267 S.C. at 503–04, 229 S.E.2d at 730. In *Lane,* the developer
of a subdivision sold an undeveloped lot to a builder. The
developer took a second mortgage on the house built on the
lot. The builder deeded the house to the developer in satisfac-
tion of its mortgage. The developer paid off the first mort-
gage on the house, and then sold it to Lane. Lane experienced
problems with the septic system, and the developer was found
liable under caveat venditor and the implied warranty of
habitability. In that case, the court found: "Trenholm pur-
ported to be selling a new house and certainly Lane's objective
in purchasing the house was to provide a home for his family.
The sale contemplated the use of the house as the dwelling;
an implied warranty does no more than fulfill the reasonable
expectations of the parties." *Id.* at 503, 229 S.E.2d at 730.

In *Kennedy,* the court further addressed the issue and
found a lender might be liable under implied warranty of
habitability in certain situations:

A lender will also incur liability for the performance of
express representations made to a buyer. A lender should
be held responsible if it is aware of defects but conceals
them from an unwitting buyer. Liability may also attach
when the lender becomes highly involved with construction
in a manner that is not normal commercial practice for a
lender. In such a situation, the lender might be said to be a
joint venturer. The lender may be liable if it is so amal-
gamated with the developer or builder so as to blur its legal

distinction. A lender may also be liable where it forecloses on a developer in the midst of construction, takes title, has substantial involvement in completing the construction and sells homes.

*Kennedy,* 299 S.C. at 340–41, 384 S.E.2d at 734 (internal citations omitted).

■ Here, we find the public policy reasons advanced in *Lane* do not apply because the Kirkmans will not be "orphaned" if they are unable to proceed against First Union. The Kirkmans know who built the house, who produced the stucco siding, and who installed the stucco siding. Their lawsuit has named all involved in the stucco siding, in addition to First Union. Significantly, the Kirkmans entered into the contract for sale with the original builder, Miller Housing. They knew Miller Housing was in foreclosure and that First Union was involved only as a lender. The Kirkmans approached First Union about completing the house when Miller failed to do so. In view of these facts, we find none of the policy considerations discussed in *Lane* justifying imposing liability under an implied warranty of habitability are present in this case.

■ Moreover, none of the situations discussed in *Kennedy* favoring lender liability are present in this case. The Kirkmans argue that First Union's expenditure of $40,000 to $50,000, standing alone, compels a finding of First Union's "substantial involvement" in completing construction. However, we do not believe the supreme court in *Kennedy* intended the issue of "substantial involvement" to be determined solely by a mathematical approach. Instead, we believe the degree of a lender's involvement, in terms of completing construction and otherwise, must be qualitatively and quantitatively determined from the totality of the circumstances. Here, according to the first contract entered into by the Kirkmans, First Union was not to foreclose on the property and the Kirkmans were to purchase it outright from the builder. In order to clear title for the Kirkmans, however, the contract was later modified to allow foreclosure by First Union. At the time, First Union was owed over $200,000 on the property. First Union was then required to complete construction, at a cost of $40,000 to $50,000. This expenditure of funds by First Union did not alter its status as a lender because First Union had a

right to expeditiously mitigate its losses resulting from the builder's financial troubles.

We find the public policy reasons articulated in *Kennedy* compel a result rejecting an imposition of lender liability on First Union. First Union was not the only party known to the Kirkmans, so they are not "orphaned" as in *Lane*. First Union would not be liable, as recognized in *Roundtree Villas*, for the stucco siding because it was not involved in the installation of the stucco siding. As found in *Kennedy*, it would be "unduly punitive to impose potential warranty liability on a lender that is searching for some way to recover the losses it has suffered due to the default of the debtor." *Kennedy*, 299 S.C. at 340, 384 S.E.2d at 734. Finally, since we find First Union was a mere lender and its completion of construction was, at most, of secondary importance to its role as a lender, we conclude that no valid, recognized policy would be served by imposing lender liability on First Union.

Accordingly, the decision of the circuit court is

**AFFIRMED.**

STILWELL and HOWARD, JJ., concur.